516 A.2d 672

Jane MAZZAGATTI and Amini Mazzagatti, a minor by Jane Mazzagatti, her parent and natural guardian and Peter Mazzagatti, Appellants,

v.

Ricky Allen EVERINGHAM, a minor by Ned EVERINGHAM, his parent and natural guardian and Rickie C. Everingham and Ned Everingham and Whitpain Township and Robert Harris and Edna Harris, Appellees.

Supreme Court of Pennsylvania.

Argued Jan. 23, 1986.

Decided Oct. 16, 1986.

268

Charles J. Weiss, Ambler, for appellants.

William H. Pugh, IV, Norristown, for Ricky Allen Everingham, a minor, et al.

M. Cathlene Driscoll, Marjorie Lawrence, Fred J. Silverman, Willow Grove, for Robert & Edna Harris.

Mark Schultz, Norristown, for Whitpan Tp.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

In the instant matter we are called upon to revisit *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979), and to review its parameters for pleading the negligent infliction of emotion-

al distress. Specifically, appellants ask us to recognize a cause of action for the negligent infliction of emotional distress in instances where the close relative does not observe the accident itself, but instead arrives at the scene of the accident and observes the victim a few minutes afterwards. We granted allocatur to clarify our position on this point.

## I.

This case arose on August 12, 1980, when fourteen-year-old Mumtaz Mazzagatti was struck and fatally injured by a car operated by appellee Ricky Allen Everingham ("Everingham") as she rode her bike in the residential area near her home in Whitpain Township. At the time of the accident Mumtaz's mother, Jane Mazzagatti ("Mazzagatti"), was at work, approximately one mile away. She received a telephone call immediately after the collision informing her that her daughter had been involved in an automobile accident. Mazzagatti arrived at the scene of the accident a few minutes afterwards. On February 12, 1981, appellants filed a three count complaint in trespass based upon Everingham's allegedly negligent conduct, the second of which is the subject of this appeal.[1] In the second count Mazzagatti pled an action for the negligent infliction of emotional distress. That count stated in part:

26. Within moments after the aforesaid accident, plaintiff Jane Mazzagatti was called and came to the scene and there observed her daughter Mumtaz Mazzagatti lying in Union Meeting Road.

27. Plaintiff Jane Mazzagatti became hysterical, unnerved and emotionally shattered as she viewed her daughter Mumtaz Mazzagatti so injured by defendants.

28. As a result of the aforementioned observation, which, in turn, resulted from a collision caused by defend-

1. Count I sets forth a cause of action for negligent infliction of emotional distress by the victim's sister, Amini Mazzagatti, who actually witnessed the accident. Count III alleges that as a result of Jane Mazzagatti's injuries as described in Count II, her husband, Peter Mazzagatti, has been deprived of her society and services.

ants' negligence, plaintiff Jane Mazzagatti suffered shock to her nerves and nervous system, sustained grievous mental pain and suffering resulting in severe depression and an acute nervous condition.

29. As a further result of the aforementioned observations and of defendants' aforementioned negligence, plaintiff Jane Mazzagatti is further tortured by flashbacks and nightmares of that observation and suffers from a general inability to sleep peacefully through the night. The residual results of the foregoing may be of a permanent nature and significance.

R. 9a–10a.

Additionally, Mazzagatti alleged that her acute nervous condition and mental distress prevented her from attending to the duties of her employment at the Sperry Corporation and might, in the future, require her to expend considerable sums for medical treatment. *Id.*

Thereafter, appellees filed a motion for summary judgment in the nature of a demurrer[2] to dismiss Mazzagatti's claim for the negligent infliction of emotional distress. Appellee's motion stated that since Mazzagatti did not view the fatal accident, she had failed to state a cause of action pursuant to *Sinn v. Burd, supra.*

**2.** Appellees elected to file a motion for summary judgment pursuant to Rule 1035(b) of the Pennsylvania Rules of Civil Procedure ("Rules") rather than to file the customary motion for judgment on the pleadings pursuant to Rule 1034 of the Rules. The motion for summary judgment is designed to supplement the motion for judgment on the pleadings to provide for an equivalent summary disposition of the case where the pleadings may be sufficient, on their face, to withstand a preliminary objection but where, in actuality, there is no genuine issue of fact and this can be conclusively shown through depositions, answers to interrogatories, admissions, or affidavits. *Ruhe v. Kroger Co.*, 425 Pa. 213, 228 A.2d 750 (1967); Standard Pennsylvania Practice 2d, vol. 6, § 32:1. The motion for judgment on the pleadings is in effect a demurrer and, in considering the motion, the court should be guided by the same principles as would be applicable if it were disposing of a preliminary objection in the nature of a demurrer. *Rice v. Rice*, 468 Pa. 1, 359 A.2d 782 (1976); *Toff v. Vlahakis*, 480 Pa. 512, 112 A.2d 340 (1955); Standard Pennsylvania Practice 2d, Vol. 6, § 31:18.

The Court of Common Pleas of Montgomery County granted appellees' motion for summary judgment on August 10, 1983. In the written opinion which followed,[3] the court held that under the parameters enunciated in our *Sinn* decision, where, as here, the close relative is not an eyewitness and did not have a contemporaneous perception of the tortious conduct, she has failed to state an actionable claim for emotional distress. Appellants appealed this determination to the Superior Court arguing that consideration be given to *Dziokonski v. Babineau*, 375 Mass. 555, 380 N.E.2d 1295 (1978), which allowed recovery where the parent arrived at the scene of the accident while the injured child was still there. The Superior Court found *Dziokonski* unpersuasive since this Court was cognizant of *Dziokonski* at the time of the *Sinn* decision and nonetheless limited our holding to those instances where the plaintiff actually witnessed the negligent act. The Superior Court thereupon affirmed the Court of Common Pleas in its order dated February 21, 1985, 341 Pa.Super. 626, 491 A.2d 925. We granted allowance of appeal on September 12, 1985, pursuant to Pa. R.A.P. 1112(a).

## II.

■ Summary judgment can be sustained only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Pocono International Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 83 n. 4, 468 A.2d 468, 470 n. 4 (1983); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 204, 412 A.2d 466, 468 (1979); *Commonwealth v. Transamerica Insurance Co.*, 462 Pa. 268, 273, 341 A.2d 74, 76 (1975); *Linwood Harvestore, Inc. v. Cannon*, 427 Pa. 434, 436, 235 A.2d 377, 379 (1967); Pa.R.C.P. 1035(b). In the case *sub judice* the facts are undisputed and the remaining legal

**3.** Since appellants appealed the trial court's determination to the Superior Court of Pennsylvania, the trial court filed a written opinion pursuant to Pa.R.A.P. 1925(a).

question for our consideration is whether the courts below erred in granting appellees' motion for summary judgment in the nature of a demurrer. It is axiomatic that a demurrer may only be sustained where the complaint, on its face, fails to establish a legal right to relief. *County of Allegheny v. Commonwealth*, 507 Pa. 360, 372, 490 A.2d 402, 408 (1985); *Cianfrani v. Commonwealth, State Employee's Retirement Board;* 505 Pa. 294, 297, 479 A.2d 468, 469 (1984); *Sinn v. Burd, supra* 486 Pa. at 150, 404 A.2d at 674; *Firing v. Kephart*, 466 Pa. 560, 563, 353 A.2d 833, 834 (1976); *Hoffman v. Misericordia Hospital of Philadelphia*, 439 Pa. 501, 504, 267 A.2d 867, 868 (1970).

For the purpose of testing the legal sufficiency of the complaint, a motion for summary judgment in the nature of a demurrer admits as true all well-pleaded, material, relevant facts. *See County of Allegheny v. Commonwealth, supra* 507 Pa. at 372, 490 A.2d at 408; *Klein v. Raysinger*, 504 Pa. 141, 144, 470 A.2d 507, 508 (1983); *Sinn v. Burd, supra* 486 Pa. at 149, 404 A.2d at 674; *Savitz v. Weinstein*, 395 Pa. 173, 174, 149 A.2d 110, 111 (1959); *Byers v. Ward*, 368 Pa. 416, 420, 84 A.2d 307, 309 (1951). If the facts as pleaded state a claim for which relief may be granted under any theory of law, then a demurrer must be denied. *County of Allegheny v. Commonwealth, supra* 507 Pa. at 372, 490 A.2d at 408; *Cianfrani v. Commonwealth, State Employee's Retirement Board, supra* 505 Pa. at 297, 479 A.2d at 469; *Mahoney v. Furches*, 503 Pa. 60, 66, 468 A.2d 458, 461–62 (1983); *Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 244, 465 A.2d 1231, 1232–33 (1983); *Sinn v. Burd, supra* 486 Pa. at 150, 404 A.2d at 674; *Packler v. State Employment Retirement Board*, 470 Pa. 368, 371, 368 A.2d 673, 675 (1977); *Schott v. Westinghouse Electric Corporation*, 436 Pa. 279, 291, 259 A.2d 443, 449 (1969); *Birl v. Philadelphia Electric Co.*, 402 Pa. 297, 302, 167 A.2d 472, 475 (1960); *Savitz v. Weinstein, supra* 395 Pa. at 174, 149 A.2d at 111; *Waldman v. Shoemaker*, 367 Pa. 587, 589, 80 A.2d 776, 777 (1951). It is

under the above standard of review that we analyze the facts of the instant case.

### A.

■ Appellants contend that the grant of demurrer was improper in this case because Mazzagatti is entitled to recover under the flexible reasonable foreseeability test adopted by this Court in *Sinn v. Burd, supra.* Appellants allege that Mazzagatti's emotional distress resulting from having promptly witnessed the entire accident scene moments after Everingham's automobile struck her child was reasonably foreseeable under the circumstances, and was neither remote nor unexpected. We believe, however, that appellants' expansive interpretation of the *Sinn* foreseeability test ignores several basic principles of tort liability. These principles, which require that the defendant's breach of a duty of care proximately cause plaintiff's injury, have established the jurisprudential concept that at some point along the causal chain, the passage of time and the span of distance mandate a cut-off point for liability. *See generally,* Wright, *Causation in Tort Law,* 73 Calif.L.Rev. 1735 (1985); Brennwald, *Proving Causation in "Loss of a Chance" Cases: A Proportional Approach,* 35 Cath.U.L. Rev. 757 (1985); Lopatka, *State Action and Municipal Antitrust Immunity: An Economic Approach,* 53 Fordham L.Rev. 23 (1984); *Note: Manufacturers' Liability to Victims of Handgun Crime: A Common-Law Approach,* 51 Fordham L.Rev. 771 (1988); Silverstein, *Seller Liability Under Section 12(2) of the Securities Act of 1933: A Proximate Cause-Substantial Factor Approach Limited by a Duty of Inquiry,* 36 Vand.L.Rev. 361 (1983); *Proximate Cause in California,* 38 Calif.L.Rev. 369 (1950). The term proximate cause or legal cause is applied by courts to those more or less undefined considerations which limit liability even where the fact of causation can be demonstrated. *See* W.P. Keeton, *Prosser and Keeton on Torts* (5th ed. 1984) (hereinafter *"Prosser and Keeton"*) at 273.

In *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970), we posited, "[t]he best statement of the rule is that a wrong-doer is responsible for the natural and proximate consequences of his misconduct." *Id.*, 436 Pa. at 403, 261 A.2d at 85. As we quoted in *Sinn v. Burd, supra,* Justice Andrews in his famous dissent in *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928) wrote:

> What we do mean by the word 'proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics. *Sinn, supra* 486 Pa. at 166, 404 A.2d at 682, *quoting Palsgraf v. Long Island R.R., supra* 248 N.Y. at 352, 162 N.E. at 103 (Andrews, J., dissenting).

We are thus charged with determining whether the policy of law in this Commonwealth holds Everingham legally responsible for the emotional injury to Mazzagatti. As the following excerpt from *Prosser and Keeton, supra,* illustrates, this determination is one fraught with circumlocution:

> It is quite possible to state every question which arises in connection with "proximate cause" in the form of a single question: was the defendant under a duty to protect the plaintiff against the event which did in fact occur? Such a form of statement does not, of course, provide any answer to the question, or solve anything whatever; but it may be helpful since "duty"—also a legal conclusion—is perhaps less likely than "proximate cause" to be interpreted as if it were a policy-free fact-finding. Thus, "duty" may serve to direct attention to the policy issues which determine the extent of the original obligation and of its continuance, rather than to the mechanical sequence of events which goes to make up causation in fact. The question whether there is a duty has most often seemed helpful in cases where the only issue is in reality whether the defendant stands in any such relation to the plaintiff as to create any legally

recognized obligation of conduct for the plaintiff's bene-
fit. Or, reverting again to the starting point, whether the
interests of the plaintiff are entitled to legal protection at
the defendant's hands against the invasion which has in
fact occurred. Or, again reverting, whether the conduct
is the "proximate cause" of the result. The circumlocu-
tion is unavoidable, since all of these questions are, in
reality, one and the same.

*Id.* at 274.[4]

We wrestled with this perplexity in *Sinn v. Burd, supra,*
wherein we were confronted with the issue whether a close
relative who witnessed the accident, albeit outside of the
zone of danger, could recover for the negligent infliction of
emotional distress. In *Sinn* we concluded that in such
instances the defendant did owe a duty of care to the
bystander, noting that "[t]he scope of potential liability
commonly finds theoretical expression in such concepts as
duty and proximate cause." *Id.* 486 Pa. at 165, 404 A.2d at
682, *quoting D'Ambra v. United States,* 114 R.I. 643, 338
A.2d 524 (1975). We held that the resultant harm was
foreseeable and stated:

> We are confident that the application of the traditional
> tort concept of foreseeability will reasonably circumscribe
> the tortfeasor's liability in such cases. Foreseeability
> enters into the determination of liability in determining
> whether the emotional injuries sustained by the plaintiff
> were reasonably foreseeable to the defendant.

*Id.* 486 Pa. at 169–70, 404 A.2d at 684.

**4.** We are well aware of the "purity" argument raised by Mr. Justice
Hutchinson. However, since *Dahlstrom v. Shrum,* 368 Pa. 423, 84
A.2d 289 (1951), the only explicit expression in a decision of this Court
of the proposition that foreseeability must be confined to an analysis
of "duty" may be found in *Berkebile v. Brantly Helicopter Corp.,* 462
Pa. 83, 337 A.2d 893 (1975), which was authored by then Chief Justice
Jones and joined in by only one other Justice, this writer. More
importantly, the utility of a strict adherence to such an approach is at
best questionable, since the terms "duty", "legal" or "proximate cause"
and "foreseeability" are all terms of art and merely reflect a policy
judgment as to the appropriate extent of liability.

We adopted the *Dillon v. Legg*, 68 Cal.2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968), parameters for determining whether the infliction of emotional distress was reasonably foreseeable. We held that a cause of action is stated when the following criteria are met:

(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it;

(2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence;

(3) Whether plaintiff and the victim were closely related as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Id.* 486 Pa. at 170–71, 404 A.2d at 685.

In *Sinn* the plaintiff-mother was present at the time of the accident and actually witnessed the injury to her child. We thus found a contemporaneous observation of the accident which proximately caused emotional distress to the mother. We limited our *Sinn* holding solely to those cases in which the plaintiff alleges psychic injury as a result of actually witnessing the defendant's negligent act. *Id.*, 486 Pa. at 166–67 n. 15, 404 A.2d at 683 n. 15. We reserved for another day the case where the mother is notified of the accident by another. *Id.*, 486 Pa. at 173 n. 21, 404 A.2d at 686 n. 21.[5]

Four years later this Court decided *Yandrich v. Radic*, 495 Pa. 243, 433 A.2d 459 (1981), wherein we denied recovery to a plaintiff-father who did not witness the accident and who did not arrive at the accident scene until after his son had been taken to the hospital. The father then pro-

5. With clairvoyance we stated:

[W]e need not here consider the case where the mother is notified of the accident by another.... [This question] may properly be left for another day. Jurisprudentially, the remote and unexpected can best be excluded by reaching these issues on a more appropriate record. *Sinn v. Burd,* 486 Pa. 146, 173 n. 21, 404 A.2d 672, 686 n. 21 (1979).

ceeded to the hospital and remained there until the boy died five days later. In a three-to-three vote we sustained the grant of demurrer in an Opinion in Support of Affirmance[6] holding that the father's pleadings had not satisfied the *Sinn* criteria and, therefore, his emotional distress was not foreseeable as a matter of law. *Id.*, 495 Pa. at 247, 433 A.2d at 461 (Wilkinson, J.). In a separate Opinion in Support of Affirmance, this writer gave the following explanation for the denial of recovery:

> The progression of the law relating to the question of responsibility for emotional distress caused to another because of one's negligent conduct, emphasizes the fact that a ruling as to what duty is owed is a legal judgment which must accommodate the demands of public policy in determining whether the law will countenance a shifting of the burden of loss in a particular situation.

*Id.*, 495 Pa. at 249–50, 433 A.2d at 462 (Nix, J).

A look at decisions from other jurisdictions that have addressed similar issues on the negligent infliction of emotional distress reveals that "only a few jurisdictions recognize the right of the plaintiff witness who did not suffer an impact, was not in fear of his own safety, or was not within the zone of danger to recover, and those jurisdictions require that the severe emotional distress to the plaintiff result from the direct and contemporaneous observance of the accident or conduct."[7] Annot., *Immediacy of Observation of Injury as Affecting Right to Recover Damages for*

---

**6.** *Yandrich v. Radic,* 495 Pa. 243, 433 A.2d 459 (1981), affirmed a Superior Court order by an equally divided Supreme Court. Justice Wilkinson filed an Opinion in Support of Affirmance in which Justice Roberts joined. This writer also filed an Opinion in Support of Affirmance. Justice Flaherty filed an Opinion in Support of Reversal joined by Justice Larsen and Justice Kauffman.

**7.** *See, e.g., D'Ambra v. United States* 354 F.Supp. 810 (D.R.I.1973); *Keck v. Jackson,* 122 Ariz. 114, 593 P.2d 668 (1979); *Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968); *D'Amicol v. Alvarez Shipping Co.,* 31 Conn.Sup. 164, 326 A.2d 129 (1973); *Leong v. Takasaki,* 55 Hawaii 398, 520 P.2d 758 (1974); *Toms v. McConnell,* 45 Mich.App. 647, 207 N.W.2d 140 (1973); *Landreth v. Reed,* 570 S.W.2d 486 (Tex.Civ.App.1978); *Grimsby v. Samson,* 85 Wash.2d 52, 530 P.2d 291 (1975).

*Shock or Mental Anguish From Witnessing Injury to Another,* 5 A.L.R. 4th 833, 835 (1985). Only three jurisdictions have allowed the recovery sought by appellants— where the plaintiff appeared on the scene of the accident immediately after its occurrence and suffered emotional distress from witnessing the victim's injuries.[8]

### B.

In light of the prior law in this area, we now embark upon an analysis of the facts of the instant case. Our first point of determination is whether Everingham owed a duty of care to Mazzagatti. As Dean Prosser phrased it, "[t]he word [duty] serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events...." Prosser, *Palsgraf Revisited,* 52 Mich.L.Rev. 1, 14–15 (1953).

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered.

*Sinn v. Burd, supra* 486 Pa. at 164, 404 A.2d at 681, *quoting Leong v. Takasaki,* 55 Haw. 398, 520 P.2d 758, 764 (1974).

In essence, the precise issue before us is whether, at the time of the accident, Everingham owed a duty of care to Mazzagatti, who was approximately one mile away from the scene of the accident. A duty of care arises only where a reasonable person would recognize the existence of an unreasonable risk of harm to others through the intervention of such negligence. *Prosser and Keeton, supra* at 199. As we noted above, a determination of a duty of care entails an analysis of its integral component, proximate cause. *Id.* 462 Pa. at 274, 341 A.2d 74.

**8.** *See, e.g., Archibald v. Braverman,* 275 Cal.App.2d 253, 79 Cal.Rptr. 723 (1969); *Dziokonski v. Babineau,* 375 Mass. 555, 380 N.W.2d 1295 (1978); *Corso v. Merill,* 119 N.H. 647, 406 A.2d 300 (1979).

■■■ We presently adhere to the view in this Commonwealth that the driver of a vehicle owes a duty of care to all motorists and pedestrians in his immediate zone of danger and to any bystander who experiences a contemporaneous observance of an injury to a close relative. In those circumstances we found that the driver's conduct was the proximate cause of the physical or psychic injury to the plaintiff. In *Sinn* we expressed the concept of proximate cause in the first two criteria of the foreseeability test, which bear repetition:

(1) Whether plaintiff was *located near the scene of the accident* as contrasted with one who was a distance away from it;

(2) Whether the shock *resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident,* as contrasted with learning of the accident from others after its occurrence. *Sinn v. Burd, supra* 486 Pa. at 170–71, 404 A.2d at 685 (emphasis added).

The corollary of those two criteria is that when a plaintiff is a distance away from the scene of the accident and learns of the accident from others after its occurrence rather than from a contemporaneous observance, the sum total of policy considerations weigh against the conclusion that that particular plaintiff is legally entitled to protection from the harm suffered. Thus, we conclude that, as relative to Mazzagatti, Everingham's conduct was not negligence at all. "Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right." *Palsgraf, supra* 248 N.Y. at 341, 162 N.E. at 99.

■■■ We believe that where the close relative is not present at the scene of the accident, but instead learns of the accident from a third party, the close relative's prior knowledge of the injury to the victim serves as a buffer against the full impact of observing the accident scene. By contrast, the relative who contemporaneously observes the tortious conduct has no time span in which to brace his or her emotional system. The negligent tortfeasor inflicts

upon this bystander an injury separate and apart from the injury to the victim. *See Sinn v. Burd, supra* 486 Pa. at 158–62 404 A.2d at 678–80. Hence, the critical element for establishing such liability is the contemporaneous observance of the injury to the close relative. Where, as here, the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions.

In reality this is a claim for affectional loss or solatium to recompense a surviving relative for her feelings of anguish, bereavement and grief caused by the fact of the injury to and death of the decedent. In *Sinn* we noted that the common law has traditionally denied a damage award for solatium. *Id.,* 486 Pa. at 151–52 n. 3, 404 A.2d at 675 n. 3. *See also Yandrich v. Radic, supra,* 495 Pa. at 250, 433 A.2d at 462–63. The feelings of anguish and bereavement suffered by Mazzagatti are not substantially different from those suffered by any parent who sees his or her dying injured child, whether it be at the scene of the accident or in the hospital room afterwards. *See Arauz v. Gerhardt,* 68 Cal.App.3d 937, 137 Cal.Rptr. 619 (2d Dist.1977); *Powers v. Sissoev,* 39 Cal.App.3d 865, 114 Cal.Rptr. 868 (2d Dist.1974). For the foregoing reasons we are constrained to conclude that the present factual situation does not justify Mazzagatti's action for the negligent infliction of emotional distress.[9]

Accordingly, the Order of the Superior Court affirming the judgment entered by the Court of Common Pleas is affirmed.

FLAHERTY, J., joins in this opinion and files a concurring opinion.

HUTCHINSON, J., files a concurring opinion.

9. In Amadio v. Levin, 509 Pa. 199, 230, 501 A.2d 1085, 1101 (1985) (Nix, C.J., dissenting), this writer expressed his personal views as to the dangers of unwarranted extension in the area of tort recovery.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, J., joins.

PAPADAKOS, J., files a dissenting opinion in which LARSEN, J., joins.

FLAHERTY, Justice, concurring.

I join the majority. Since authoring the Opinion in Support of Reversal in *Yandrich v. Radic*, 495 Pa. 243, 433 A.2d 459, I have come to the view expressed by Mr. Chief Justice Nix. This body, the Supreme Court of the fourth largest state of the United States, must take a leading role in re-evaluating the social utility of an ever expanding and increasingly imaginative tort system. It is illusory to believe the public does not pay for tort recoveries, or that resources for such are limitless. As it is with everything, a *balance* must be struck—certain limits drawn. We are, in the end, dealing with money, and that money must come from somewhere—from someone: the public pays for the very most part by increased insurance premiums, taxation, prices paid for consumer goods, medical services, and in loss of jobs when the manufacturing industry is too adversely affected. A sound and viable tort system—generally what we now have—is a valuable incident of our free society, but we must protect it from excess lest it becomes unworkable and alas, we find it replaced with something far from desirable.

HUTCHINSON, Justice, concurring.

I concur in the result. I cannot, however, join the majority opinion because it needlessly injects foreseeability into causation analysis. In a negligence action, the plaintiff must show that the tortfeasor owed a duty to him, a breach of that duty, actual damages and a causal connection between the damages and breach of the duty owed. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983).

Duty, in large part, limits the persons to whom an actor is responsible for damage caused by careless conduct. Causation, perhaps more precisely legal causation, limits the type

of damages for which an actor is responsible. This case involves a careless actor's liability for a parent's grief over an injury to her child; it involves legal cause not duty. We have long held that the concept of foreseeability determines the scope of the duty owed by the tortfeasor not causation. *Cantwell v. Allegheny County*, 506 Pa. 35, 483 A.2d 1350 (1984); *Zilka v. Sanctis Construction, Inc.*, 409 Pa. 396, 186 A.2d 897 (1962), *cert. denied*, 374 U.S. 850, 83 S.Ct. 1915, 10 L.Ed.2d 1070 (1963). We unequivocally stated the inapplicability of foreseeability to causation in *Dahlstrom v. Shrum*, 368 Pa. 423, 428–29, 84 A.2d 289, 292 (1951) (emphasis in original):

> We are in accord with the doctrine that foreseeability has no place when we are considering *proximate or legal cause.* Foreseeability, however, is an element, as above indicated, when the question of negligence is being considered. ... [T]he question of foreseeability *in connection with proximate cause* has no application.

We have replaced the traditional "proximate cause" analysis with the more modern "legal cause" analysis now in use in many of our sister states as evidenced by its description in the Restatement (Second) of Torts. *Vattimo v. Lower Bucks Hospital, Inc.*, 502 Pa. 241, 465 A.2d 1231 (1983); *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977); *Whitner v. Lojeski*, 437 Pa. 448, 263 A.2d 889 (1970) (Opinion Announcing the Judgment of the Court). The Restatement sections describing the test courts use for causation state:

§ 430. Necessity of Adequate Causal Relation

In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm.

§ 431. What Constitutes Legal Cause

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.

Foreseeability is no more a part of this causation formulation than proximate cause. The test focuses on the effect of the tortfeasor's acts, not their foreseeability or likelihood. Section 435(1) eliminates any remaining doubt by specifically excluding foreseeability from causation analysis.[1]

§ 435. Foreseeability of Harm or Manner of Its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

In this case, I would hold that no causal connection satisfying the standard for legal causation described in § 431, now in use in this jurisdiction as a matter of common law, has been shown and affirm Superior Court.

In addition, as the majority points out, appellants' claim is for solatium, grief and bereavement caused by the child's death. We have long held that recovery for solatium is not allowed. *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979) (Opinion Announcing the Judgment of the Court); *Ferne v. Chadderton,* 363 Pa. 191, 69 A.2d 104 (1949); *Vincent v. City of Philadelphia,* 348 Pa. 290, 35 A.2d 65 (1944). This is also the law in the vast majority of our sister jurisdictions, 14 A.L.R.2d 485, 495 (1950), and the Restatement view, Restatement (Second) of Torts § 436A comment c (1965). Accordingly, appellants' claim also fails under § 431(b) of the Restatement. Our well-established rule precluding recovery for solatium relieves the actor from liability.

---

**1.** On its face, Section 435(2) seems to introduce foreseeability into causation analysis when it seems highly unlikely that the conduct should have caused the harm. However, comment c to that section explains that this is really a negligence, not a causal, consideration.

LARSEN, Justice, dissenting.

I join Justice Papadakos' dissenting opinion in this case and reaffirm my position as expressed by Justice Flaherty in *Yandrick v. Radic*, 495 Pa. 243, 433 A.2d 459 (1981) (Opinion in Support of Reversal, joined by Larsen and Kauffman, JJ.).

Accepting the allegations of the complaint as true,. as we must for purposes of this appeal, Ms. Mazzagatti lost a daughter as a result of appellee Everingham's negligence, and witnessed the horrifying (to any parent) aftermath of the accident. Her emotional distress was the natural, probable and foreseeable result of that accident.

I also am disturbed by the majority's apparent concern for the plight of the insurance industry, although cloaked in the guise of concern for the "consumer public." The majority expresses concern "as to the dangers of unwarranted extension in the area of tort recovery," majority at 278, n. 8, and to illustrate the dangers, cites the dissenting opinion of Chief Justice Nix in *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085, 1101 (1985). That dissenting opinion in *Amadio* states:

> Another basic fallacy with the thinking of those who propose unlimited expansion of tort recovery is the failure to recognize that it is the consumer public that ultimately must bear the loss for the inflationary spiral that follows in its wake. More frequent judgments with escalating awards creates a situation that all policy holders, and not the insurance companies, ultimately must meet. The rising costs, generated by increasing numbers of law suits and higher judgments are tolerable provided that the occasion for the injury justifies the action and the recovery reflects the actual loss. If either is out of kilter an undue burden is unfairly passed on to the innocent citizen policy holders.

*Id.*, at .509 Pa. 231–232, 501 A.2d 1101–02.

First, to my knowledge no member of the bench or the bar of this Commonwealth has ever "propose[d] unlimited

expansion of tort recovery" and it is misleading and overly dramatic to suggest that recognition of a cause of action for negligent infliction of emotional distress for *this* plaintiff under the circumstances of *this* case will lead inexorably to unlimited or unwarranted expansion of tort recovery.

Second, it is manifestly inappropriate for an appellate court to take judicial notice of the "plight of the insurance industry," adopt the industry's unilateral, self-serving and hotly contested assessment as to the causes of that plight (i.e., "increasing numbers of law suits and higher judgments"), and factor this assessment into its determination of whether an injured party has stated a cause of action. While the army of insurance lobbyists has convinced some observors that "increasing numbers of lawsuits and higher judgments" have contributed to the "inflationary spiral" and have increased cost to the "consumer public" by way of higher premiums and unavailability of coverage, that theory of causation of the "insurance crisis" is far from universally accepted. In fact, a significant and growing body of public opinion controverts not only the insurance industry's theory of causation and its cry for tort reform, but also the statistics and "worst-case" anecdotes that have been played upon by the industry to fuel this engine of reform. For example, the Consumers Union, an independent, non-profit, unaffiliated research and testing organization, has recently written:

> In its advertising and in most statements to the press and the public, the insurance industry lays blame for the crisis on lawyers, juries, or victims whose alleged carelessness brought on their own problems. Lawyers use the civil justice system "to right every imagined wrong," cries the Insurance Information Institute, an industry trade group.

> A more objective analysis suggests that the "crisis" is of the insurance industry's own making. A Washington state task force concluded last year that the crisis "is mostly a result of poor management practices by the [insurance] companies." In New York, a report of the

Governor's Advisory Commission on Liability Insurance said that "the industry's poor recent financial condition largely reflects self-inflicted wounds."

\* \* \* \* \* \*

The insurance industry is trying to turn its crisis into an opportunity—a chance to press for one of its favorite objectives, "tort reform." In plain words, the industry's version of tort reform means placing limits on the rights of injured people to sue for and recover damages. Consumer Reports, August, 1986, *The Manufactured Crisis, Liability-Insurance Companies Have Created A Crisis And Dumped It On You,* 544–545. The Consumers Union is certainly not the first to suggest that the "insurance crisis" is largely a product of the industry's greed, bad management and risky investments and that the industry's bemoaning of excessive jury verdicts and the "litigation explosion" are greatly exaggerated and inaccurate. *See, e.g.:* Fortune, July 7, 1986, *Tort Laws Under Fire;* Mac-Neil/Lehrer News Hour, July 1, 1986, Transcript No. 2807, *Freeze in Florida [Insurance Premiums]* (featuring debate between, inter alia, insurance industry representatives and Ralph Nader on behalf of the National Insurance Consumer Organization over responsibility for the "insurance crisis"); Ledewitz, B., *Are Tort Reform Proposals Constitutional?,* Pa.Law Journal-Reporter, June 23, 1986 (Controversy over the extent and, indeed, the existence of a liability insurance crisis in this country fills the media today."); McCombie, B., *The "Catch-22" In Insurance,* Newsweek, August 11, 1986; Los Angeles Times, May 1, 1986, *Data Refutes Claim of "Deep Pocket" Victimization, Prop. 51 Foes Assert* (opponents of California's Proposition 51 charge that "municipal insurance crisis" is being used as a "front" by insurers to avoid paying their full share of damages in personal injury suits); The Economist, March 1, 1986, *Litigious America;* National Journal, February 15, 1986, *Legal Affairs: Finger-Pointing Distinguishes Attempts To Fix Blame For Liability Crisis;* The Washington Post, January 7, 1986, *Nader Charges Insur-*

*ers With Price-Gouging; Cf.* Financial Times, April 14, 1986, *Survey: Insurance And Insurance Broking 5; U.S. Industry Under Consumer Fire.*

It is inappropriate for this Court to gratuitously enter this debate, particularly where no case or controversy or evidence concerning the "insurance crisis" has been presented to us in an adversarial setting designed to test the statistics and theories of both sides of the issue. It is unseemly for this Court to arbitrarily choose sides in the debate and, by dictum, align itself with the insurance industry and attempt to judicially "solve" the enormously complex insurance crisis by denying Ms. Mazzagatti the right to seek recovery for her injuries, distress and deep trauma wrought at the hand of a careless driver.[1] The debate over who or what to blame for the insurance crisis in America should be carried on in the marketplace of ideas and public opinion and in the halls of the legislatures, not rashly injected as make-weight rationalization in a judicial opinion offered to justify the denial of redress in the courts to a deserving plaintiff for her injuries.

PAPADAKOS, J., joins this dissenting opinion.

PAPADAKOS, Justice dissenting.

I dissent from the majority's conclusion that a parent who learns that her child has been fatally injured in an accident, and who arrives on the scene of the accident within a few minutes of the tragedy, is unable to assert a claim for the

---

1. It has been suggested that "what is needed to alleviate the problem is not tort reform but better regulation of the insurance industry." *Consumer Reports,* supra at 548. Such regulation would include price regulation "to keep prices on an even keel, discouraging both excessive and artificial cyclical price cuts that endanger the health of insurance companies and excessive price hikes that create hardships for consumers," limiting the companies ability to cancel and non renew coverage where the "level of risk" has not become unreasonable, "beefing up" the insurance regulators and consumer advocacy, subjecting the insurance industry to antitrust laws, enact conflict-of-interest policies for the insurance regulators, and provide incentives for business and municipalities with good, proven safety records. *Id.* at 548–49.

negligent infliction of emotional distress against the persons responsible for the accident, because the mother was not an eyewitness to her child's slaughter.

The opinion in support of reversal authored by Mr. Justice Flaherty in *Yandrich v. Radic,* 495 Pa. 243, 433 A.2d 459 (1981), best expresses my views on this subject, and leads me to conclude that there is no reason, either in justice or public policy, why the liability of the tortfeasor should not be extended to cover actual harm caused by the emotional distress experienced by a parent who, although she did not witness the accident, experienced emotional trauma wrought her by the mangled condition of her child. In *Yandrich, supra,* Messrs. Justice Flaherty, Larsen and Kauffman articulately pleaded that the extension of liability permitted by this Court in *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), should apply in situations where a parent suffers emotional injury because of trauma to his child, even though the parent was not a witness to the accident. Noting that the guiding principle of analysis is that "one may seek redress for every substantial wrong," Mr. Justice Flaherty observed the obvious, that "in most cases, a parent's receipt of news that his child has been killed in an accident will cause the parent severe emotional distress." *Yandrich* 495 Pa. at 253, 433 A.2d at 464.

I agree that whether such distress actually exists and whether it was caused by a defendant's negligence are questions for the jury. Legally, this distress, if it exists, is a "substantial wrong." Once again, this Court draws arbitrary lines in favor of shutting the doors of the courts of this Commonwealth against those who would establish their injuries and seek redress in direct opposition to the guarantees reserved in the people by Article I, Section 11, of our Constitution:

> There should be no hesitation to permit recovery for the emotional distress experienced by a parent who, although he did not witness the accident, nevertheless, experienced

emotional trauma because of his son's injury. There is substantial injury in both cases. Who can say that the emotional strain experienced by the parent witnessing the death of his child is greater than the emotional strain experienced by a parent sitting helplessly in a hospital while his child dies? Certainly, the experiences of the parents are different, but each has an inescapable common element: the child is dead. *Yandrich*, 495 Pa. at 253–254, 433 A.2d at 464.

While the author of these views has since abandoned them, I am proud to adopt them as my own to pick up the torch in the agon which would insure that the injured can find redress in our courts for the harms done them.

The majority seems to suggest that the harm caused by the emotional trauma is no more serious, and has no more a lasting effect, than the grief we ordinarily suffer with the loss of a loved one. I agree that grief alone is not the type of harm which should be compensated by money damages. However, the existence of actual physical or mental harm must be left to findings of the jury based upon evidence presented to it.

If a person suffers actual harm from the wrongful conduct of another, then damages must be awarded. The Pennsylvania Constitution, Article 1, Section 11, mandates that:

[E]very man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law . . .

We can do no more than enforce this right by giving Mrs. Mazzagatti the opportunity to assert her claim of emotional distress against the persons responsible for the accident which killed her child.

I join Justice LARSEN's dissent.

LARSEN, J., joins this dissenting opinion.