**Array Healthcare Facilities
Solutions Inc. v. Pesce**

548

*Harold I. Goodman,* for plaintiff.
*Matthew Chabal III, Jeffrey M. McCormick, James D. Hollyday, Steven J. Engelmyer* and *Paul G. Gagne,* for defendants.

TERESHKO, *J.,* November 9, 2006—

PROCEDURAL HISTORY

Defendants Array Healthcare Facilities Solutions Inc., Douglas C. Lindsay and Patricia D. Malick appeal from

the court's order dated May 23, 2006, denying their preliminary objections.

## FACTUAL BACKGROUND

Plaintiff Domenic Pesce was an architect and planner whose work focused primarily on the design and planning of healthcare facilities. (Complaint, ¶10.) In November 2002, the company of BLM/CRA Inc., which is a predecessor company to defendant Array, hired Pesce as chief financial officer of its planning division. (Complaint ¶12.)

On or about May 2004, Array and Pesce orally agreed to certain terms and conditions for Pesce to assume the role of president of Array, an architectural practice, which centers on the design and planning of healthcare facilities. (Complaint, ¶¶11-13.) Pursuant to the oral agreement, Pesce alleges he was to receive an annual base salary of $160,000; a guaranteed annual bonus of $90,000; stock and membership on Array's board of directors. (Complaint, ¶16.) Also in May, Pesce became a party to a shareholder's agreement (buy-sell agreement) with BLM/CRA Inc. Pursuant to the consent form attached to the buy-sell agreement executed May 11, 2004, Pesce was to receive two stock certificates evidencing his ownership of 14,702 shares of Array stock (approximately 11 percent of the company's outstanding shares). (Responses to preliminary objections, p. 4, complaint, exhibit B.) Pursuant to the "Notice of preemptive rights for the issuance of new shares of BLM/CRA Inc.," the board of directors of BLM/CRA Inc. agreed to sell one stock certificate evidencing 3,776 shares to Pesce for the purchase price of $81,447. (Complaint, exhibit B.) The

remaining stock certificate evidencing 10,926 was purchased by Pesce at a later date.[1] Although section 17 of the buy-sell agreement between BLM/CRA Inc. d/b/a BLM Architects contains an arbitration clause, none of the several drafts of the employment agreement between Pesce and Array contain any arbitration clause.

Shortly after entering into the oral agreement, Array submitted a written employment agreement. The written agreement purportedly did not reflect the oral representations made in the oral agreement. (Complaint, ¶18.) Pesce informed chief financial officer and senior vice president of Array, Carl Davis, of the inaccuracies in the written agreement and neither Pesce nor Array executed the written agreement. Despite the failure to execute a written agreement, Pesce began employment as president in May 2004. (Complaint, ¶19.)

In June 2005, approximately one year after the written employment agreement was rejected by both parties, Davis provided Pesce with a revised written agreement. (Complaint, ¶21.) Once again, the terms did not conform to the oral agreement first agreed upon by the parties.

On June 13, 2005, Pesce gave to Davis a second revised written agreement that included handwritten amendments by Pesce to the parties' earlier oral agreement. (Complaint, ¶23.) Although Pesce signed the second revised written agreement, it was never executed by any member of Array.

1. Some of the details of when and how Pesce acquired the stock certificates are unclear due to the vagueness of BLM's resolution and notice of its board of directors. Although the "Notice of preemptive rights for the issuance of new shares of BLM/CRA Inc." indicated that the 3,776 shares of stock were received on May 12, 2004 in consideration for the purchase price of $81,447, it is not clear under what terms Pesce acquired the remaining shares. (See complaint, exhibit B.)

In October 2005, Pesce was informed by the accountant who worked at Array, that Davis believed Pesce and the accountant were having an affair. The accountant further explained that her husband also believed this to be the situation. (Complaint, ¶26.)

However, Pesce asserts that he became aware that the accountant and Davis were currently having the ongoing affair. (Complaint, ¶27.)

The accountant further explained that because of her husband's mistaken belief that Pesce was involved in the affair with her, Pesce was potentially in danger. (Complaint, ¶28.) In addition to the contention about extra-marital affairs within the office, Pesce was further informed by the accountant that Davis had written an unauthorized check in the amount of $168,000 without the prior knowledge or approval of Pesce. (Complaint, ¶29.)

Pesce confronted Davis about these allegations. When Davis refused to take any actions to remedy these issues, Pesce informed the board of directors that Davis may have engaged in financial misconduct in violation of the company's resolutions of the board of directors. (Complaint, ¶32.) In addition, Pesce requested an independent third-party investigation into Davis' conduct, as well as into Array's accounting and IT practices and controls. Pesce also requested Array to provide personal protection for himself and his family. *Id.*

According to Pesce, Davis, in response to these reported allegations, falsely stated to Array board members that Pesce was mentally unstable and that he was stealing clients from Array. Pesce also alleges that defendant Douglas Lindsay, who is the chief executive officer of Array, falsely stated that Pesce requested to be demoted from his position as president. (Complaint, ¶37.)

Pesce stated that on October 27, 2005, he was demoted to director of planning without cause or justification by the board of directors of Array. (Complaint, ¶40.) He states that this was a result of an inadequate investigation into the aforementioned issues by the Array board. Following the demotion, Pesce's base salary was reduced from $160,000 to $115,000; he was also denied his guaranteed bonuses of $90,000 for his performance in 2004 and 2005. (Complaint, ¶43.) Pesce was also removed as a shareholder and relinquished of his rights to any stock ownership and was denied earned shareholder distributions totaling approximately $50,000. (Complaint, ¶46.) In addition, Pesce was also denied other fringe benefits as a result of the promotion. (Complaint, ¶¶47-49.) Plaintiff states, that when he obtained the services of legal counsel to send correspondence to Davis and Lindsay outlining what Pesce believed to be unlawful conduct which demanded remediation, he was terminated without cause or justification, contrary to his employment agreement, without any severance package. (Complaint, ¶51.)

Plaintiff instituted this action March 7, 2006, alleging various claims for breach of contract, defamation, intentional infliction of emotional distress, wrongful discharge and violation of the Pennsylvania Wage Payment and Collection Law.

On April 26, 2003, defendants filed their preliminary objections to plaintiff's complaint and plaintiff filed responses thereto. By order dated May 23, 2006, the trial court overruled the defendants' preliminary objections and ordered defendants to file their answers to the complaint.

On June 14, 2006, defendants filed their notice of appeal to the May 23, 2006 order and issued their 1925(b) statement of matters accordingly.

The sole issue on appeal is whether the trial court committed an error of law and/or abuse of discretion in overruling the preliminary objections pertaining to the arbitration clause in the buy-sell agreement, wherein the plaintiff's claims for breach of contract are separate and distinct from the buy-sell agreement.

## LEGAL ANALYSIS

Where any doubt exists as to whether a demurrer should be sustained, it must be resolved in favor of overruling the demurrer. *Kyle v. McNamara & Criste,* 506 Pa. 631, 487 A.2d 814 (1985); *Baker v. Magnetic Analysis Corporation,* 347 Pa. Super. 188, 500 A.2d 470 (1985). The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Kyle v. McNamara & Criste,* 506 Pa. at 634, 487 A.2d at 816. A demurrer should be sustained only in cases where the plaintiff has clearly failed to state a claim upon which relief may be granted. *Eckell v. Wilson,* 409 Pa. Super. 132, 597 A.2d 696 (1991). A demurrer should not be sustained if there is any doubt as to whether the complaint adequately states a claim for relief under any theory of law. *Id.* In reviewing the complaint, we are to regard all well-pleaded facts as true and to give plaintiff the benefit of all favorable inferences that we could fairly deduce from these facts. See *Mazzagatti v. Everingham,* 512 Pa. 266, 516 A.2d 672 (1986).

Since the sustaining of a demurrer results in a denial of the pleader's claim or a dismissal of his suit, a pre-

liminary objection in the nature of a demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted. *Schott v. Westinghouse Electric Corporation,* 436 Pa. 279, 259 A.2d 443 (1969). If the facts as pleaded state a claim for which relief may be granted under any theory of law then there is sufficient doubt to require the preliminary objection in the nature of a demurrer to be rejected. *Packler v. State Employes Retirement Board,* 470 Pa. 368, 371, 368 A.2d 673, 675 (1977).

The appellate court's standard of review of a denial of preliminary objections in the nature of a petition to compel arbitration "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." *Midomo Company Inc. v. Presbyterian Housing Development Co.,* 739 A.2d 180, 186 (Pa. Super. 1999).

Where a party to a civil action seeks to compel arbitration of that action, a two-part test is employed to determine if arbitration is required. First, the trial court must determine if a valid agreement to arbitrate exists between the parties. *Id.* Second, if the trial court determines that such an agreement does exist, it must then determine if the dispute involved is within the scope of the arbitration provision. *Id.* "[T]he scope of arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally." *Henning v. State Farm Mutual Automobile Insurance Company,* 795 A.2d 994, 996 (Pa. Super. 2002). "Arbitration is a matter of contract and, as such, it is for the court to determine whether an express agreement between the

parties to arbitrate exits." *Smith v. Cumberland Group Ltd.,* 455 Pa. Super. 276, 687 A.2d 1167, 1171 (1997).

As noted above, in May 2004, Mr. Pesce became a party to a shareholder's agreement "buy-sell agreement" with Array. Pursuant to this agreement, Mr. Pesce received two stock certificates evidencing his ownership of 14,702 shares of Array stock.

In the course of Mr. Pesce's demotion and termination from Array, he was removed as a shareholder of Array and stripped of his ownership of all Array stock. The buy-sell agreement contains both an arbitration provision (section 17) and a forum selection clause (section 21.1). The arbitration provision provides that disputes "arising out of, under, in connection with, or in relation to" the agreement shall be subject to arbitration. The forum selection clause provides that "any suit or action arising out of, under, in connection with, or in relation to" the agreement shall have a venue of Cumberland County. In addition to his removal as shareholder and ownership of the stock, Pesce was additionally denied an earned shareholder distribution totaling approximately $50,000. To the extent Pesce relies at all on the buy-sell agreement in his complaint, it is to compel specific performance that Array purchase all of the terminated shareholder's shares under section 5 of the buy-sell agreement.

It is defendants' position that the broad language of these provisions requires that either the entire action be submitted to arbitration or that it be transferred to Cumberland County. The shareholder's agreement, on its face, is intended to address the transfer of Array stock, not to govern the employment relationships among Array and its shareholders. The plaintiff's contention in this action

is based on a breach of the employment contract. Thus, defendants cannot use the shareholder's agreement as a vehicle either to shift the venue of this entire action to another forum or to send it to arbitration.

"A court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute." *Bel-Ray Co. Inc., v. Chemrite Ltd.,* 181 F.3d 435, 440 (3d Cir. 1999). "As a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so." *Painewebber Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir. 1990). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Sandvik v. Advent Int'l Corp.,* 220 F.3d 99, 105 (3d Cir. 2000). However, a party "can be compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if common-law principles of agency and contract support such an obligation on his or her part." *Bouriez v. Carnegie Mellon University,* 359 F.3d 292, 294 (3d Cir. 2004).

Our Superior Court has stated that there is no appreciable difference between Pennsylvania law and the provisions of the FAA on the enforceability of agreements to arbitrate. *Lytle v. Citifinancial Services Inc.,* 810 A.2d 643, 656 (Pa. Super. 2002). A court must apply traditional principles of contract interpretation in order to determine whether an arbitration clause exists. *Id.*

In *United States SBA v. Chimicles,* 2004 U.S. Dist. Lexis 20333, *15, (aff'd, United States SBA v. Barrack,* 447 F.3d 207 (2006)), the Third Circuit Court of Appeals held that where a limited partnership agreement that contains an arbitration clause cannot be incorporated by

reference into a related but separately executed subscription agreement,[2] which does not contain any such clause. The court stated that they are *"independent documents"* and cannot be construed as one for enforcement purposes. *Id.* (emphasis added) The court went on to say that the lack of an arbitration clause in the limited partnership agreement indicates intent not to arbitrate disputes arising from that agreement. *Id.*

In upholding *Chimicles,* the *Barrack* court highlighted the fact that both the subscription agreement and the partnership agreement had integration agreements. The *Barrack* court stated,

"Section 3.5 of the subscription agreements provides that '[t]his instrument contains the entire agreement of the parties, and there are no representations, covenants or other agreements except as stated or referred to herein.' Likewise, section 13.6 of the partnership agreements provides that '[t]his agreement constitutes the complete and exclusive statement of the agreement between the partners.'" *Barrack,* 447 F.3d at 210.

Much like in *Barrack* and *Chimicles,* section 20.8 of the buy-sell agreement states,

"This agreement, together with any agreement note, or other instrument or document executed or to be executed pursuant to the terms and conditions of this agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and replaces and supersedes any and all prior oral or written agreements, representations and discussions pertaining to the subject matter hereof or thereof."

---

2. A subscription agreement is an application by an investor to join a limited partnership. http://financial-dictionary.com.

Section 11.0 of the employment agreement also contains an integration clause which states,

"This agreement contains the entire agreement of the parties with regard to the subject matter hereof and supersedes any and all prior oral or written understandings and agreements between them. This agreement may be amended or modified only by an agreement in writing signed by both parties."

The *Barrack* court also found that in determining whether the parties intended to be bound by an arbitration clause in one of the contracts, we must look at the parties who entered into the contract and the party bringing the action. In examining this principle the court stated,

"First, the agreement to arbitrate was made between the general partner and the private limited partners—*i.e.,* the signatories to the partnership agreement. Second, section 13.7 emphasizes that the arbitration clause was intended to apply to (1) actions to enforce provisions of the partnership agreement and (2) actions brought by the private limited partners." *Id.*

According to the facts as asserted by plaintiff, which must be given deference at this stage, there was an oral employment agreement and no valid written employment agreement between Pesce and Array. This oral employment agreement did not have or incorporate an arbitration clause. The buy-sell agreement, which was a separate written agreement entered into between Pesce and the shareholders of BLM/CRA, was entirely distinct because Array was not a party to it. The arbitration clause was only binding as to the contract between plaintiff and BLM/CRA. According to the rationale of the *Barrack* court, the lack of any contractual relationship between

Array and Pesce at time of signing the buy-sell agreement (which was between BLM/CRA and Pesce) further indicates that separateness and independence of this document from the oral employment agreement between Pesce and Array. Therefore, the jurisdiction over the Pesce's case is not influenced by the arbitration clause included in the buy-sell agreement and is properly before the court of common pleas.

Lastly, in comparing the relationship of the documents at issue in *Chimicles* to the documents in this case, the limited partnership agreement and the subscription agreement are more closely related documents than the buy-sell agreement and the employment agreement in this case, because the *Chimicles* documents touch upon the specific issue of the company's partnership parameters. The buy-sell agreement and the employment agreement do not touch on such a specific issue, rather they encompass more disparate issues of Pesce's employment (employment agreement) and the option *to purchase* the predecessor company's fringe benefits that were offered for him (buy-sell agreement).

Thus, according to the case law, the employment agreement and the buy-sell agreement are independent documents and the arbitration clause of the buy-sell agreement cannot be said to apply to Pesce's employment agreement.

Despite this court's finding that the entire action should not be transferred to arbitration pursuant to the buy-sell agreement, the court does not intend to split the issues with respect to the buy-sell agreement and the employment contract into two separate actions. Rather, pursuant to Pa.R.C.P. 213.1, this court wishes to keep these actions

together and within the jurisdiction of the Philadelphia Court of Common Pleas, because both agreements arise out of the same transaction or occurrence.

The buy-sell agreement and its arbitration clause encompasses only one aspect of the recovery sought under the complaint. Pesce seeks compensation for salary, annual bonuses, membership on the board of directors and rights to purchase stock. Although the complaint does contain specific counts for recovery under the buy-sell agreement, the promotion of judicial efficiency and the minimization of delay, costs, redundancy and possibility of inconsistent verdicts that may occur from separate proceedings far outweigh any prejudice associated with coordination of actions in the Philadelphia Court of Common Pleas. See Pa.R.C.P. 213.1(a). Rule 213.1(a) provides for coordination of actions when there are proceedings pending in different counties which involve a common question of law or fact or which arise from the same transaction or occurrence. The interest in coordinating actions before the Philadelphia Court of Common Pleas would prevent having arbitration in Cumberland County pursuant to the buy-sell agreement and a trial in Philadelphia Court of Common Pleas on the employment agreement. This could also result in an inconsistent verdict with the findings of the Philadelphia Court of Common Pleas.

Taken into consideration the circumstances and weighing the judicial efficiency against any prejudices, the court properly determined that this action was one that should remain within the province of the Philadelphia Court of Common Pleas and not transferred to arbitration.

## CONCLUSION

In light of the foregoing analysis, this court believes that defendants', Array Healthcare Facilities Solutions Inc., Douglas C. Lindsay and Patricia D. Malick, preliminary objections, were properly denied, and respectfully requests that they be affirmed by the court above.

