Catherine **WRIGHT individually and as administrator of the Estate of Patricia Carlin, Appellant**

v.

Paul **EASTMAN and Marion Eastman, Appellees.**

Superior Court of Pennsylvania.

Argued Aug. 22, 2012.
Filed Jan. 22, 2013.

William S. Stickman, IV, Pittsburgh, for appellant.

Bradley J. Linsenmeyer, Pittsburgh, for appellees.

BEFORE: MUSMANNO, J., BOWES, J., and WECHT, J.

OPINION BY WECHT, J.

Catherine Wright ("Appellant"), individually and on behalf of the estate of Patricia Carlin ("Decedent"), challenges the trial court order of December 1, 2011. That order granted summary judgment to Paul and Marion Eastman ("Appellee").[1] We reverse and remand.

---

1. Because most references to Appellee concern Paul Eastman, we will use the singular "Appellee."

We begin by reproducing the trial court's opinion in its entirety:

[Appellant] has appealed from the Order of Court granting [Appellee's] Motion for Summary Judgment in the above matter. The evidence established that decedent was struck by a motor vehicle driven by [Appellee], who was traveling home from work in the early-morning hours. The evidence established that [Appellee] was driving on [Pittsburgh–McKeesport Boulevard] in the curb lane when decedent appeared in front of his vehicle.

Decedent was struck by [Appellee's] vehicle and ultimately died from the injuries sustained in that accident. The decedent had a blood alcohol level at .42% at the time of the accident. No evidence was presented to suggest that [Appellee] had seen decedent in front of his vehicle until he was within one-and-a-half car lengths of her. The evidence established that [Appellee] applied his brakes but, unfortunately, could not stop in time. There was no evidence that [Appellee] was speeding, and the police report prepared reflects that [Appellee] was going below the posted speed limit. There is no evidence that [Appellee] was being inattentive, nor was there any evidence that he could have done anything to prevent the accident.

[Appellant] sought to present the testimony of two experts to establish that [Appellee] could have seen the decedent from 160 feet to 170 feet away and that based on that distance, [Appellee] could have stopped his vehicle. The difficulty with [Appellant's] position, however, is that no facts support the proposition that [Decedent] was on the road at the distance at which [Appellant's] experts say she could have and should have been seen. No evidence of record exists to establish when decedent was on the street other than the testimony of [Appellee] that he saw her when he was within two car lengths of her. On the record generated, there is simply no evidence to establish [Appellee's] negligence. The expert opinions sought to be proffered by [Appellant] lacked a factual basis—namely, there is no evidence to establish that [Decedent] was on the road in the area and at the time that would support [Appellant's] claim that [Appellee] should have seen the decedent. In the absence of any facts to support the experts' conclusions, their testimony is not relevant. Expert testimony is incompetent if it lacks an adequate basis in fact. The expert is allowed only to assume the truth of testimony already in evidence. While an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. *Veiner* [*Viener*] *v. Jacobs*, 834 A.2d 546, 558 (Pa.Super.2003); *see also Cuthbert v. City of Philadelphia* [417 Pa. 610], 209 A.2d 261, 264 (Pa.1965).

Given the lack of factual basis to support the proffered testimony of [Appellant's] experts, it is readily apparent that [Appellant] cannot establish [Appellee's] negligence. Accordingly, the Motion for Summary Judgment was properly granted.

Trial Court Opinion, 1/19/2012 ("T.C.O."), at 2–4 (citations modified).

Appellant raises four issues on appeal. Yet her argument presents one overarching question: Whether the trial court incorrectly assumed, disregarded, or weighed various items of evidence, including lay deposition testimony and expert reports, in granting summary judgment to Appellee?

■ Our standard of review of a trial court order granting summary judgment is well-settled:

> A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. *Capek v. Devito* [564 Pa. 267], 767 A.2d 1047, 1048, n. 1 (Pa.2001). As with all questions of law, our review is plenary. *Phillips v. A–Best Prods. Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995).
>
> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. "Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof ... establishes the entitlement of the moving party to judgment as a matter of law." *Young v. PennDOT*, 560 Pa. 373, 744 A.2d 1276, 1277 (2000). Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State Univ. v. County of Centre*, 532 Pa. 142, 615 A.2d 303, 304 (1992).

*Murphy v. Duquesne Univ. of the Holy Ghost*, 565 Pa. 571, 777 A.2d 418, 429 (2001) (citations modified). When "it is not inconceivable that a reasonable mind could reach the conclusion that the defendant breached its [duty]," a claimant may not be denied submission of that question to a jury. *Cox v. Equitable Gas Co.*, 227 Pa.Super. 153, 324 A.2d 516, 518 (1974). Moreover:

> [T]he issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Summers v. Certainteed Corp.*, 606 Pa. 294, 997 A.2d 1152, 1159 (2010) (citations omitted).

■ To state a claim for negligence, a claimant must establish the presence of a legal duty or obligation; a breach of that duty; a causal link between that breach and the injury alleged; and actual damage or loss suffered by the claimant as a consequence of thereof. *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286 (Pa.Super.2005). We have held that "a pedestrian has a perfect right to rely on the exercise of reasonable care by the drivers of automobiles on the highways. A pedestrian may not cross a street without exercising due care, but whether that care has been manifested or not is a question of fact for the jury." *Lavely v. Wolota*, 253 Pa.Super. 196, 384 A.2d 1298, 1302 (1978) (citation omitted); *see Mazzagatti v. Everingham by Everingham*, 512 Pa. 266, 516 A.2d 672, 679 (1986) ("[T]he driver of a vehicle owes a duty of care to all motorists and pedestrians in his immediate zone of danger....").

At issue in this case is not the existence of a general duty of care owed by Appellee to pedestrians, which is materially undisputed. Clearly, there is no doubt that Decedent sustained fatal injury in this case.

Finally, if a jury were to find that Appellee breached his duty to Decedent, causation would not be at issue, *simpliciter,* although contributory negligence might obviate Appellee's liability for damages. *See* 42 Pa. C.S. § 7102 (providing that when a claimant's contributory negligence exceeds the negligence of the tortfeasor, claimant is barred from recovering damages).[2] Rather, at issue in this case is the sufficiency of Appellant's evidence to establish a genuine issue of material fact regarding whether Appellee breached his duty to Decedent. The trial court found that Appellant had failed to establish such an issue, and consequently granted summary judgment to Appellee. In so ruling, the trial court erred.

Appellant contests the trial court's conclusion that no evidence outside the four corners of Appellant's expert reports, whether viewed in isolation or in tandem with those expert reports, created a question for the fact-finder. Appellant further contests the trial court's conclusion that Appellant's experts' reports were in all relevant particulars based to an impermissible degree on conjecture.

We begin by reviewing the evidence submitted by Appellant in opposition to Appellee's motion for summary judgment. Appellee testified that the fatal accident occurred around midnight on either June 15 or 16, 2008. Deposition Transcript, Paul Eastman, 12/21/2010 ("Appellee's Depo."), at 13–14. Appellee was traveling southeast on Pittsburgh–McKeesport Boulevard, on his way home from his 3:00 P.M. to 11:00 P.M. shift at the Edgar Thompson Works, U.S. Steel, located in Braddock, Allegheny County. *Id.* at 15, 18, 20. Appellee attested that his car, a

Ford Escort wagon, was in good mechanical order with properly functioning headlights and clear windshield glass. *Id.* at 18–19. The roads were dry, and no inclement conditions impeded Appellee's vision of the road. *Id.* at 19–20. Appellee was taking only "mild" medications to treat high blood cholesterol and blood pressure. *Id.* at 17. He had not consumed alcohol. *Id.*

In the relevant stretch of highway, Pittsburgh–McKeesport Boulevard was a four-lane, undivided road, with two lanes traveling south and two lanes traveling north; there was no dedicated left-turn lane. *Id.* at 20–21. There was at least one streetlight in the general vicinity of where Appellee's car struck Decedent; Appellee testified that the impact occurred just past that streetlight. *Id.* at 23.

Appellee testified that he was traveling at approximately thirty miles per hour, and that the posted speed limit where the accident occurred was thirty-five miles per hour. *Id.* at 22. He testified that he drove slowly as a consequence of "[h]ow the road is constructed. . . . You're going through the bends. . . ." *Id.* He further attributed his speed to the fact that "a lot of deer come through there. You got the woods on that side and they come running across. And I had experience with deer shooting across and you don't want to go too fast." *Id.* at 23.

Appellee testified that he was proceeding southbound in the right lane of two southbound lanes. He was "hugging" the line between the two southbound lanes because trees overhang the right lane in the area in question. *Id.* at 42. Appellee explained:

**2.** As noted by the trial court, Decedent's blood alcohol level was measured, post-mortem, at 0.42 percent, an extremely high ratio. However, we agree with Appellant that this has no bearing on whether she has made out a *prima facie* case requiring submission to a jury. The question at this stage must be addressed outside any evidence in mitigation of Appellee's liability or Appellant's damages in the event that liability is found.

[APPELLEE.] [Decedent] was like in front of me, like, you know, towards the center of the car. You know, I thought maybe to the right a little bit, you know, or center. . . .

[APPELLANT'S COUNSEL.] When you put on your brakes, you did not swerve to the left. . . . [C]orrect?

A. Right.

Q. You also did not swerve to the right, did you?

A. No, I just stopped the car and—it happened.

*Id.* at 41–42.

Appellee testified more than once that he did not see Decedent until he was nearly on top of her—estimating her distance from him at first sight as one and a half to two car lengths. *Id.* at 22. He did not have time to swerve in either direction, but agreed that he "did have enough time after seeing her to move [his] foot from the accelerator, to the brake pedal." *Id.* at 35.

Regarding how Decedent came to be in the road before him, Appellant testified:

Q. As you sit here today, do you have any idea where [Decedent] came from immediately prior to ending up in front of your car?

A. Unless it was from the woods [lining the right side of the boulevard].

Q. Do you know? That's my question. Do you have—

A. I didn't see her come out of the woods, no.

Q. The very first time you saw her she was already in the road?

A. Yes.

*Id.* at 36.

Q. You told the police officer that you were traveling in the far right lane and suddenly there was a woman in front of you?

A. Right. When I seen her with my headlights.

Q. You have no idea where she came from, true?

A. True.

*Id.* at 49. He later added:

Q. You never saw her prior to her appearing in front of your car, correct?

A. No.

* * * *

Q. The first time you see her she is in your lane of travel?

A. Right.

Q. You have no idea as you sit here today where she was coming from, correct?

A. No.

Q. You don't know where she was going, correct?

A. No.

Q. You don't know how she got there, correct?

A. Correct.

Q. What was she wearing?

A. Well, she had dark clothing mostly. You know, when I seen her it was really—the only thing that stood out was her face. Like, you know, the rest—the dark areas and the clothes and all that, her face, that's the only—stood out.

Q. Just so we're clear, prior to the impact, from the point you first saw her to the point where your vehicle struck her, you never saw her move in any way, did you?

A. No. Just—no, like you mean attempt to get out of the road?

Q. Right, you never saw—

A. She was just there standing, like. I mean . . .

Q. You were never able to observe the manner in which she was walking or—

A. No, like if she tried to get out or anything like that. No, she was just there. . . .

*Id.* at 60–61.

The lead investigator, Detective Kenneth Ruckel of the Allegheny County Police Department, substantially corroborated Appellee's testimony, albeit with some potentially significant differences. For example, Detective Ruckel repeatedly testified that Appellee's car struck Decedent while traveling between thirty and thirty-two miles per hour. Deposition Transcript, Kenneth Ruckel, 2/23/2011 ("Ruckel Depo."), at 13–14. This conclusion arguably is at odds with Appellee's testimony, noted above, that he was traveling at roughly that speed before seeing Decedent, but that he "did have enough time after seeing her to move [his] foot from the accelerator to the brake pedal." Appellee's Depo. at 35.

Detective Ruckel also testified that Appellee's car struck Decedent somewhere between the bumper's midline and the driver's side headlight, Ruckel Depo. at 24, an observation that diverges somewhat from Appellee's testimony that his car bumper struck Decedent on the passenger's side of the bumper's mid-point. Appellee's Depo. at 41–42. Detective Ruckel observed that the damage to the hood was "primarily on the driver's side of the car." *Id.* at 27–28.

Detective Ruckel's accident report, as well, contained information that contrasted with Appellee's testimony. Principally, this involved Decedent's outfit at the time of impact, the color of which bears on her visibility in Appellee's headlights and the expected distance at which she would have become visible to an alert driver (a phenomenon addressed below by one of Appellant's experts). As set forth, *supra,* Appellee simply characterized Decedent's clothing as dark, and indicated that he saw only her face before impact. Detective Ruckel, however, observed in his accident report that Decedent, a white female with auburn hair, was wearing a white lace shirt with black running shorts bearing a white stripe down the sides of the legs. Initial Report of Detective Kenneth Ruckel, 6/16/2008, at 2. Thus, Decedent's lower legs were exposed.

Detective Ruckel testified that the investigating forensic pathologist concluded that Decedent had been struck on the left side of her body. Ruckel Depo. at 43. Detective Ruckel stated that the pathologist's conclusions did not "tell us in which direction she was traveling at [impact], if at all." *Id.* at 43–44.

In addition to this testimony, Appellant proffered the reports of two expert witnesses. The trial court rejected those experts' analyses and conclusions for want of an adequate factual foundation, finding that they depended on the proposition that Decedent had been in the road for a longer period of time than the available evidence substantiated.

First, Appellant introduced the report of Walter J. Kosmatka, offered to determine at what distance Decedent would be "detectable (discernible) to an oncoming driver." Report of Walter J. Kosmatka, 3/23/2011 ("Kosmatka Report"), at 2. Mr. Kosmatka is an engineer with a career-long history of employment in the design and testing of automobile lighting, as well as the development of government and manufacturing standards for headlights, beginning as early as 1969. *See generally* Curriculum Vitae, Walter J. Kosmatka, March 2010. In preparing his analysis, Mr. Kosmatka reviewed: Detective Ruckel's police report and deposition; photographs of the accident scene and Appellee's vehicle; and the depositions of Appellees Paul and Marion Eastman. Kosmatka Report at 1. Mr. Kos-

matka observed that, while it was unclear whether the subject vehicle's headlights were set to high beam or low beam at the time of the accident, Detective Ruckel indicated that the vehicle's high beams were on when he arrived at the scene. *Id.* Mr. Kosmatka further opined that, based upon Appellee's testimony, Decedent "was standing in, not crossing, the roadway." *Id.*

We need not parse the detailed account of methods, assumptions, and formulae that Mr. Kosmatka used to arrive at his conclusions. However, it is worth observing that Mr. Kosmatka carefully detailed his analytic approach and its scientific basis. Moreover, he identified with specificity the evidence he relied upon and how that evidence factored into his analysis. He also delineated his assumptions, all of which indisputably were either "conservative" or neutral relative to the available evidence, assuming an Appellee-friendly account of the circumstances.

For example, Mr. Kosmatka explained that there are "expectant" and "non-expectant" drivers, and that the latter require far greater luminance to detect an obstacle at a given distance than the former:

> Automotive lighting engineers and research scientists have conducted night-time field experiments designed to assess the enhanced visual requirements prevalent in normal driving situations. The investigations showed that drivers who were not aware that they were involved in a night-vision experiment, and so had no expectation of finding an obstacle in or near their vehicle's path, required a highly elevated level of obsta-

cle luminance for an unexpected obstacle to capture their attention. In the classic experiment by Roper and Howard, the obstacle luminance at the point of detection for drivers in a *"non-expectant"* state was *four times* that which it was when these same drivers were *consciously participating in a field test* in which they *expected* to find an obstacle.

*Id.* at 3 (emphasis in original). For the purposes of his analysis, and in obvious contrast to Appellee's testimony regarding his concern for deer crossing the road on the boulevard, Mr. Kosmatka assumed that Appellee was a non-expectant driver, thus elevating the expected luminance requirements to enable detection of Decedent in the road. *Id.* Similarly, assuming that the only materially illuminated portion of Decedent was her lower legs, Mr. Kosmatka based his calculations on 1.8 square feet of Decedent's (white) skin. *Id.*[3]

Utilizing the above-mentioned, Appellee-friendly presumptions, Mr. Kosmatka recited the following results:

> By graphical means, it is possible to determine at what distance the illumination requirement is satisfied by the illumination from the headlamp system.

> For the lower legs, using a reflectance factor of 30%, the obstacle luminance requirement of a non-expectant driver was satisfied at a distance of approximately 170 feet.

> In the interests of determining the sensitivity of the result to the assumption of skin reflectance, a second comparison was done using a factor 1/3 lower for the reflectance. . . .

---

**3.** Mr. Kosmatka did not disregard Detective Ruckel's observation that Decedent also was wearing a lacy white shirt or blouse when she was struck. However, in conservatively assuming that Appellee was using his low beams at the time of the accident, Mr. Kos-matka indicated that the downcast low beam headlamps would not significantly illuminate the blouse at the distances in question. *Id.* at 2. However, according to Appellee's testimony, at a distance of thirty feet only Decedent's face alerted him to her presence in the lane.

In this case, the detection criterion for a *non-expectant driver* was satisfied at 150 feet.

Even a reflectance factor 1/3 lower, 13%, would still yield a detection distance of 131 feet.

*Id.* at 4 (emphasis in original). Next, Mr. Kosmatka, briefly departing from his conservative assumptions, added the following observation: "Had the *high beam been illuminated, the detection distance would increase significantly,* bringing into play the high reflectance of white shirt material (about 70%) and the greatly increased intensity in the upper beam. . . ." *Id.* (emphasis in original).

Appellant also offered the expert report of Kevin E. O'Connor, P.E. Mr. O'Connor is an accredited accident reconstructionist, with professional experience in accident analysis and traffic engineering beginning in 1975. *See generally* Curriculum Vitae, Kevin E. O'Connor, P.E. Mr. O'Connor indicated that he reviewed, *inter alia,* the police reports regarding the accident; photographs of the accident location augmented by a personal visit to the site; photographs of the vehicle; the depositions of Detective Ruckel and Appellee Paul Eastman; and the report of Mr. Kosmatka. Report of Kevin E. O'Connor, 5/24/2011 ("O'Connor Report"), at 2.

Mr. O'Connor offered the following:

Perception-reaction time for a surprised driver, like Mr. Eastman, typically is approximately 1.5 seconds. A vehicle traveling at a speed of 30 to 32 miles per hour will cover approximately 66 to 71 feet in a perception-reaction time of 1.5 seconds. [4] Braking to a stop from an initial speed of 30 to 32 miles per hour will take approximately 40 to 46 feet for a vehicle like the Eastman Escort under

hard braking. Combining these two elements, the total stopping distance for Mr. Eastman from his first sight of [Decedent] would have been approximately 106 to 117 feet based on Detective Ruckel's estimate of the Escort's speed (30 to 32 miles per hour) at the time of the accident.

\* \* \* \*

According to Detective Ruckel's measurements at the scene, the Eastman car came to rest approximately 74 feet south of the most northern of the accident-related recorded debris (glass). Based on Mr. Eastman's testimony that he was traveling at a speed of 30 miles per hour, it has been determined that he could have brought his vehicle to a complete stop in approximately 106 feet. His initial reaction to [Decedent] would then have occurred when he was less than 32 feet from her.

Even under a worst case scenario, i.e. darkness with no ambient lighting, dark clothing, pedestrian on the driver's left and low beam headlights, Mr. Eastman should have seen [Decedent] in a distance greater than 32 feet.

*Id.* at 5. Based on these observations, Mr. O'Connor concluded: "Mr. Eastman either drove too fast under the circumstances or, he was not attentive to the roadway in front of him. . . . At his stated speed of 30 miles per hour, Mr. Eastman had sufficient time and distance to bring his vehicle to a complete stop . . . and should have avoided a collision with [Decedent]." *Id.* at 6.

The trial court entered summary judgment for two stated reasons, one contingent upon the other. First, the trial court, in effect, took as granted that Decedent could not be shown to have been on the

---

4. This raises a question regarding the accuracy of Appellee's testimony that he was able to apply the brakes before striking Decedent, assuming the truth of his claim that she was approximately thirty feet away when he first noticed her.

road when Appellee was more than thirty feet away because no one contradicted Appellee's testimony to that effect. Second, based upon the first inference, the trial court ruled that the expert testimony was ineffectual due to its dependence on what amounted to unfounded conjecture that Decedent was in the road when Appellee was 150 to 170 feet away. Neither expert specifically so concluded. The above review of the experts' factual bases, circumstantial premises, and conclusions makes clear that Mr. O'Connor believed that Appellee could have stopped had he seen Decedent at a distance significantly shorter than 170 feet. Moreover, Mr. O'Connor did not address at all the issue of Appellee's ability to swerve away from Decedent, had Appellee seen her at some earlier time.

In *Lewis v. U.S. Rubber Co.*, 414 Pa. 626, 202 A.2d 20 (1964), our Supreme Court held that circumstantial evidence alone may suffice to prove a claim of negligence by the requisite preponderance of the evidence:

> While evidence, to warrant recovery must picture or visualize what happened sufficiently to permit the fact-finder reasonably to conclude that the defendant was guilty of negligence, it is equally true that it is not essential to have direct or eyewitness testimony and that proof may be furnished by circumstantial evidence. It is not necessary that a plaintiff be able to prove the cause of the accident by direct evidence, it being sufficient if the testimony supports inferences which may reasonably be drawn by a jury. Proof of negligence by circumstantial evidence has been applied in a wide variety of cases in Pennsylvania. . . .
>
> The plaintiff is required to show only circumstances from which a reasonable conclusion may be drawn that the accident occurred because of the negligence of the defendant. Certainty of proof is not required. Some proof must necessarily be circumstantial[,] but where it strongly tends to show that what occurred was due to defendant's negligence the issue is for the jury.
>
> * * * *
>
> A plaintiff is entitled to have his case considered by the jury even though he does not show that the *only* reasonable inference is that defendant's negligence was the proximate cause of the accident. It is enough that he produces evidence which may properly be found by the jury to justify *an* inference that the defendant's negligence was the proximate cause of the accident because such evidence outweighs, even though it does not *exclude* [,] an inference that the defendant was not negligent or that his negligence was not the proximate cause of the accident.
>
> * * * *
>
> [I]t is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. The judge cannot say as a matter of law which are facts and which are not unless they are admitted or the evidence is inherently incredible.

*Id.* at 22–23 (internal quotation marks and citations omitted; emphasis in original).

In addressing the two facets of the trial court's ruling, we begin with the trial court's reliance upon Appellee's testimony regarding the thirty-foot distance at which he first observed Decedent. We must address this issue first, because it informs our review of the trial court's rejection of Appellant's expert analyses as insufficient to establish a genuine issue of material fact.

In *Carl v. Kurtz*, 255 Pa.Super. 198, 386 A.2d 577 (1978), this Court considered a motion for new trial in a motor vehicle

accident case in which one vehicle's speed at or just prior to impact was at issue. We held that "Pennsylvania courts have long permitted the use of circumstantial evidence" to establish vehicle speed; and will generally uphold a finding of negligence based on such evidence." *Id.* at 580 (citations omitted). Notwithstanding the unrebutted direct testimony of a lay witness concerning the vehicle's speed, "[t]he factfinder is not bound to accept the testimony of a witness, even where that witness' testimony stands uncontradicted. Credibility of oral testimony is peculiarly for the jury to determine." *Id.; see Borough of Nanty–Glo v. Amer. Surety Co. of N.Y.,* 309 Pa. 236, 163 A. 523, 524 (1932) ("However clear and indisputable may be the proof when it depends upon oral testimony, it is nevertheless the province of the jury to decide . . . ." (internal quotation marks omitted)).[5] In short, it is a "jury's prerogative to disbelieve a witness' testimony," even when unrebutted, *Carl,* 386 A.2d at 580, and a party is entitled to have a jury do so.

Based upon the foregoing case law, we cannot endorse the trial court's reliance on Appellee's testimony regarding when he first observed Decedent in the road for the proposition that Decedent was not visible to Appellee at any time before he first saw her. We are precluded from doing so first because it is not for the trial court to assess whether Appellee's testimony was credible; perhaps Appellee would wilt under cross-examination in ways that undercut his deposition testimony. This is precisely why the jury must be permitted to assess his credibility. We also may not do so because it would not be mandatory for the jury, even if it credited Appellee's tes-

timony regarding the distance at which he observed Decedent, to conclude that that was the earliest moment at which he could have observed Decedent. This is the critical inquiry in determining whether Appellee breached his duty to Appellee—not **when** he saw her in fact, but when it was his **duty** to see her, such that his failure to do so would amount to a breach of that duty. The trial court conflated these inquiries, confounding the process by which a jury, following examination and cross-examination of the witness in open court, assesses the credibility of testimony, and makes such inferences as are permissible therefrom.

This is not the only way in which the trial court intruded upon the province of a jury. For example, the trial court openly concluded that "[t]here was no evidence that [Appellee] was speeding" (citing Appellee's own self-serving testimony and Detective Ruckel's police report, which concluded only that Appellee **struck** Appellee at a speed below the posted limit); "no evidence that [Appellee] was being inattentive" (despite the fact that Appellee himself testified that he did not see Decedent at a distance greater than thirty feet, but that he never saw her move into the position at which he first saw her); and no evidence "that he could have done anything to prevent the accident" (also implicitly relying on Appellee's own self-serving testimony). T.C.O. at 3.

■ Having addressed the prematurely determined factual premise underlying the trial court's ruling, we must next consider the trial court's broader conclusion that Appellant's expert witnesses lacked sufficient foundation for their conclusions.

---

**5.** Although *Nanty–Glo* concerned entry of a directed verdict, Pennsylvania courts have applied the same rule in the context of summary judgment at least since the Supreme Court's

decision in *Bremmer v. Protected Home Mut. Life Ins. Co.,* 436 Pa. 494, 260 A.2d 785 (1970).

That conclusion requires consideration in its own right.

As Appellant correctly notes, the trial court relied on two non-summary-judgment cases to support its rejection of the experts' opinions in their entirety at such an early stage in the proceedings. *See* T.C.O. at 3 (citing *Cuthbert v. City of Philadelphia*, 417 Pa. 610, 209 A.2d 261, 264 (1965); *Viener v. Jacobs*, 834 A.2d 546, 558 (Pa.Super.2003)). However, it is beyond cavil that the benefit of the doubt owed to the non-moving party in the summary judgment context is categorically more generous than the standard of review in a hearing regarding expert qualifications and methods pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), or the standard applied to the presentation of expert evidence in open court before a jury. Thus, we will not dwell on the trial court's inapposite citations, the only two it cited in support of its rejection of Appellee's experts.

Rather, we will review a case decided in this procedural context. In *Summers v. Certainteed Corp.*, 606 Pa. 294, 997 A.2d 1152 (2010), our Supreme Court set forth the following standard of review regarding consideration of expert testimony in deciding a motion for summary judgment:

> It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury. *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525, 528 (1995); *In re Estate of Hunter*, 416 Pa. 127, 205 A.2d 97, 102 (1964) ("The credibility of witnesses, professional or lay, and the weight to be given to their testimony is strictly within the proper province of the trier of fact."). Accordingly, trial judges are required "to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof." *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1045 (2003) (citing *Frye*, 293 F. 1013).
>
> At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. *Toy v. Metro. Life Ins. Co.* [593 Pa. 20], 928 A.2d 186, 195 (Pa.2007). This clearly includes all expert testimony and reports submitted by the nonmoving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, *see Grady; Frye*, and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact. *Miller*, 664 A.2d at 528.

*Summers*, 997 A.2d at 1161 (citations modified). Thus, the question presented is whether the trial court correctly concluded that "the conclusions contained within [Appellant's expert reports were not] sufficiently supported." Only if that is the case did the court properly grant summary judgment.

It is clear to us that neither of Appellant's experts specifically concluded that Decedent was squarely in the road or visible when Appellant was 150 or 170 feet away from her—or at least that any such implicit conclusion was critical to Appellant successfully presenting a case for liability at trial. Mr. Kosmatka, for example, opined principally as to the distance at

which Appellee, given conservative assumptions about Decedent's reflectivity and other considerations, could have been expected to see her had he been a "non-expectant" driver who was attending appropriately to the road and had Decedent been in the road at the relevant time. Mr. Kosmatka calculated 150 to 170 feet based solely upon the exposed skin of her legs, and assuming that Appellee's low beams were on when the accident occurred. This was despite the fact that Detective Ruckel indicated that Appellee's high beams were activated when Detective Ruckel arrived on the scene. Were Appellee's high beams activated, Mr. Kosmatka opined to a reasonable degree of scientific certainty that Decedent's white lace blouse would have come into play, rendering her visible at a distance significantly greater than 170 feet.

Mr. O'Connor, in turn, relied, *inter alia*, on Mr. Kosmatka's opinion and the information provided by Detective Ruckel and Appellee to conclude that, even as a non-expectant driver, Appellee should have been able to stop in approximately 130 feet after seeing Decedent. Integrating Mr. O'Connor's conclusions with Appellee's testimony to the effect that he was worried about the threat of deer, a jury reasonably could conclude that Appellant was, in fact, an attentive driver who would take less than 130 feet to stop (or swerve) than the hypothetical non-expectant driver relied upon conservatively by Mr. O'Connor in calculating Appellant's stopping distance.

■ We find that the evidence establishes a jury question regarding the time of Decedent's arrival in the lane. Hence, the necessary imprecision of the expert reports concerning the expected distance at which Decedent would have been visible to Appellee does not render those opinions infirm for purposes of summary judgment. Even if we took at face value Appellee's deposition testimony that he first observed Decedent at a distance of approximately thirty feet (a presumption to which Appellee is not entitled on summary judgment), this would not change the fact that, without the power instantly to materialize in a new location,[6] Decedent must have traversed the distance from one side of the road or the other to the point where she was struck. This ostensibly would have required **some** period of time during which Decedent would have been visible to Appellee, assuming the jury credited Mr. Kosmatka's opinion. Were jurors to credit Appellant's experts, including their observations regarding the time increments in which a car at a given rate of speed covers a given distance, and were they to weigh their own experience of how long it takes a person to move from the side of the road to a travel lane and come to the motionless state,[7] they might fairly conclude that Decedent was in range of Appellee's headlights at a distance significantly, perhaps dispositively, greater than thirty feet.

As noted above, moreover, in the opinions of Detective Ruckel and Mr. O'Connor, Appellee **struck** Decedent at between thirty and thirty-two miles per hour, a conclusion distinct from Appellee's testimony that this was his rate of travel **before** he struck Decedent. Appellee further testified that he was able to apply the brakes before striking Decedent, a proposition accepted by the trial court. *See* T.C.O. at 2–3 ("The evidence established

---

6. In the world of Harry Potter, wizards refer to this mode of travel as *apparition*. *See Harry Potter Wiki*, http://harrypotter.wikia.com/wiki/Apparition (last reviewed Dec. 20, 2012).

7. This question might further be informed by consideration of Decedent's severely elevated blood alcohol content at the time.

that [Appellee] applied his brakes but, unfortunately, could not stop in time."). Were this believed by the jury, it could lead the jury to believe that Appellee's speed at impact was less than it was before he applied the brakes. That conclusion, in turn, would call into question the credibility of Appellee's testimony regarding his speed before he saw Decedent.

For a jury to believe that Appellee was negligent, the jury would need to conclude that Appellee had a duty to see Decedent at some distance greater than thirty feet. To further refine this question, the jury would be required to reach certain conclusions about rate of travel, visibility, and the distance by which Appellant would have had to see Decedent in order to stop short of Decedent or swerve to miss her. These are all topics touched upon by Appellant's experts, even if they have not reached precise conclusions on all of those topics. But, it bears repeating that Appellee testified that he did not see Decedent until she was already standing in the road, and yet he never saw her in motion. This testimony, combined with the conclusions regarding Decedent's visibility, viewed in a light most favorable to Appellant, clearly could lead a jury to conclude that Decedent was visible at a substantially greater distance than thirty feet. Based on the above-reviewed evidence, the jury also could conclude, based on Appellee's own testimony, that Appellee was, in fact, an expectant driver in the sense used by Mr. Kosmatka, and, as such, should have seen some sign of Appellant, whether at rest or in motion, at a distance significantly greater than thirty feet. Such circumstantial evidence could lead a jury reasonably to conclude that Appellee's breach of duty was a proximate cause of Decedent's death.

In the foregoing discussion, we speculate about what further evidence-taking might reveal, and what a jury might conclude. In doing so, we do not specifically credit or weigh any of the available evidence of record, nor do we forecast or suggest any particular result at trial. Moreover, we do not intend prematurely to dispose of any issues pertaining to the admissibility of the expert testimony that might be tested and resolved in a *Frye* hearing. Nor do we opine in any way on the weight a jury should place on expert reports that undeniably, and necessarily under these circumstances, rely upon certain assumptions and inferences based upon circumstantial evidence. Weighing these reports and the experts' related testimony, if any, is for the jury. We merely apply the governing standard of review, *de novo* as is our task, and find that Appellant has made out a substantial question of material fact as to each element of negligence. Consequently, the trial court erred as a matter of law in concluding otherwise.

Order reversed. Case remanded for further proceedings.