J-A20039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHAEL BRITCHER AND KIMBERLY BRITCHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| ERIE INSURANCE COMPANY | : | |
| | : | No. 672 EDA 2025 |
| Appellant | : | |

Appeal from the Judgment Entered February 5, 2025
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 230100761

BEFORE: MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED OCTOBER 9, 2025**

Defendant Erie Insurance Company ("Erie") appeals from the judgment entered in favor of the plaintiffs, Michael Britcher and Kimberly Britcher (collectively, "Britchers"), in the amount of $186,251.78 contemporaneous with the trial court's denial of Erie's post-trial motion.[1] Erie dually contends that the court should have granted its motion for a new trial and motion for

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See Taxin v. Shoemaker**, 799 A.2d 859, 860 (Pa. Super. 2002) (holding that "where a trial court denies a party's post-trial motion[] *and* unequivocally enters judgment in the same order, that order is immediately appealable"). We also note that, although the appealed-from judgment is dated February 4, 2025, pursuant to Pennsylvania Rule of Appellate Procedure 108(b), the judgment's proper date is February 5, 2025, which is "the date on which the clerk ma[de] the notion in the docket that written notice of entry of the order ha[d] been given as required by Pa.R.Civ.P. 236(b)." Pa.R.A.P. 108(b). We have amended the caption accordingly.

judgment notwithstanding the verdict ("JNOV"). In particular, Erie asserts that

the court improperly admitted an estimate offered by the Britchers, warranting

a new trial, and that Erie's unrebutted evidence demonstrating that the at-

issue property was undamaged established its right to JNOV. We affirm.

The trial court summarized the facts of this case as follows:

This is a breach of contract action arising from a claim by [the Britchers] under their homeowner's insurance policy issued by [Erie]. On or about January 25, 2022, [the Britchers'] home experienced an electrical surge which caused thermal damage to electrical wiring in the home. Pursuant to the homeowner policy, Erie issued [the Britchers] a "replacement cost value payment" of $2,960.91 on February 10, 2022. Thereafter, [the Britchers] continued to experience electrical difficulties from the power surge. Approximately one year later, [the Britchers] submitted a claim for additional electrical damages which Erie denied. [The Britchers] instituted this action for breach of contract by way of writ of summons filed January 9, 2023, followed by a complaint filed on July 7, 2023.

The crux of [the Britchers'] claim is contained in an estimate for additional damages from Larry Weaver [] of Weaver Adjustment Group in the amount of $186,251.78 (["]Estimate["]). This Estimate was admitted into evidence through Weaver's testimony. [Weaver] testified that the nature of the damage sustained by [the Britchers'] home was an electrical surge that necessitated that electrical wiring be replaced. In formulating his opinion, Weaver relied in part on the work of his colleague, Bill Reynolds, who inspected the property. Weaver also relied on two estimates authored by electrician Rashawn Woods from Light It Up Electric for replacement of electrical wiring, replacement of a generator, and replacement of an [air conditioning] unit. Weaver testified that the overhead and profit pertaining to [] Woods'[s] estimates were for hiring a general contractor who would be required to oversee the repair.

Erie retained the services of an engineer, Vixar Patel of Rimkus Consulting Group. [] Patel is a professional engineer who is licensed in Pennsylvania as well as other states. Since 2019[,]

Patel has been [performing] forensic investigations for insurance companies and attorneys. [] Patel testified that all the electrical circuits were functioning properly, and [the Britchers'] report was flawed. Specifically, [] Patel opined that: (1) electrician Woods conducted the testing incorrectly, (2) the claimed damage to the electrical wiring was impossible based upon the event, (3) and the results submitted in Wood's report did not align with the conditions at the property.

This matter was tried on August 19-21, 2024, resulting in a jury verdict in favor of [the Britchers] in the amount of $186,251.78. [Thereafter,] Erie filed [its] post-trial motion[, which the court subsequently denied, and the court thereafter entered judgment consistent with the jury's verdict. Erie timely appealed.]

Trial Court Opinion, 2/5/25, at 1-3 (record citations omitted).

Erie raises two issues for our review:

1. Did the trial court err by denying its motion for a new trial where Weaver's Estimate was improperly admitted into the record as Weaver, himself, did not provide expert testimony, did not have knowledge of the claim in which he based his testimony, and he did not provide scientific evidence or methodology to support the Estimate's findings?

2. Did the trial court err by denying its motion for JNOV where the undisputed evidence showed that Erie's electrician had tested the electrical system after the Britchers' inspection and determined that it was working properly?

*See* Appellant's Brief at 4.

Initially raised via motion for a new trial, Erie's first claim on appeal challenges the court's decision to admit the Estimate. Such a contention requires us to employ the following standard of review:

The Superior Court's standard for reviewing the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case. We will reverse the trial court's denial of a new trial only where there is a clear abuse of discretion

- 3 -

or an error of law which controlled the outcome of the case. The trial court abuses its discretion when it misapplies the law or when it reaches a manifestly unreasonable, biased[,] or prejudiced result. Abuse of discretion may occur through an honest, but erroneous use of discretion. A new trial may not be granted merely because the evidence conflicts and the jury could have decided for either party. The grant of a new trial is appropriate, however, where the jury verdict may have been based on improperly admitted evidence.

*Rohe v. Vinson*, 158 A.3d 88, 95 (Pa. Super. 2016) (citation omitted). Even in cases where there has been some sort of incorrect determination made by the court, the concept of harmless error "underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000).

As to the admissibility of evidence, such determinations lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. *See Commonwealth Fin. Sys., Inc. v. Smith*, 15 A.3d 492, 496 (Pa. Super. 2011). An abuse of discretion in the context is defined similarly to our new trial standard. *See Keystone Dedicated Logistics, LLC v. JGB Enters., Inc.*, 77 A.3d 1, 11 (Pa. Super. 2013). In addition, "to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Winschel v. Jain*, 925 A.2d 782, 794 (Pa. Super. 2007) (citation,

quotation marks, and brackets omitted).

Erie challenges the admission of the Weaver Estimate, which rendered a proposed price that was identical to the ultimate jury award of $186,251.78. Erie underpins its assertion with several points: (1) Weaver's testimony,[2] supporting the Estimate's admission, "did not offer any scientific or specialized information that was useful to the jury[]"; and (2) "Weaver could not swear that he had examined the [at-issue property], and he offered no documentary or physical evidence that he had conducted an inspection of any sort[.]" Appellant's Brief at 22. Instead, Weaver's employee, and not Weaver himself, went to the property, took measurements, and plugged that information into a piece of estimation software, Xactimate. ***See id.***

Pennsylvania Rule of Evidence 702 governs the admissibility of expert testimony as follows:

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

**(b)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

---

[2] Weaver was admitted as an expert in damages.

> **(c)** the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Nevertheless,

> the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on[,] or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.

**Snizavich v. Rohm and Haas Co.**, 83 A.3d 191, 197 (Pa. Super. 2013).[3]

Erie avers that Weaver's testimony "strayed into matters of common knowledge[,]" and was therefore distinctly not an "expert opinion" within the meaning of our evidentiary rules and prior caselaw. Appellant's Brief at 28. Instead, Weaver merely opined personally based on a printed "estimate that he did not create from software that he did not create[.]" **Id.** Erie suggests that "[a]ny competent adult could have done the same thing." **Id.** Erie then highlights apparent omissions in Weaver's testimony:

> [Weaver's E]stimate is simply a line-item detailing [] various proposed repairs. [Weaver] does not offer any analysis of the loss, photos of the loss, or details of an inspection. He does not offer any opinion as to causation on the various items detailed in his

---

[3] While **Snizavich** speaks to "scientific authority," 83 A.3d at 197, as it was a case directly requiring scientific knowledge, here, as discussed more fully *infra*, Weaver was relying on technical or other specialized knowledge to ascertain the Estimate. **See** Pa.R.E. 702. Accordingly, under the circumstances, Weaver was required to employ technical or other specialized authority, consistent with **Snizavich**.

estimate[;] he is simply offering a dollar amount based on estimate data that he [did not] generate[], collect[,] []or analyze[]. He did [not] present any analysis, photos, or details of the loss[] because he did not perform an inspection.

*Id.* at 28 (record citation omitted). Instead of relying on any discrete scientific authority, Erie maintains that Weaver merely utilized the Xactimate software. To the extent that Weaver relied on the site information, and data obtained therefrom, collected by one of his employees, the record reflects ambiguity on that point. *See* Appellant's Brief at 31 (highlighting a compound question asked of Weaver at trial, answered with a singular yes, in relation to whether he relied on the employee's work and whether the employee was "involved in that process"); N.T. Jury Trial, 8/20/24, at 107 (the question, as posed).

The court disposed of Erie's evidentiary challenge, contesting Weaver's status as an expert and the admissibility of the Estimate, as follows:

Weaver testified that in formulating his Estimate[,] he relied on two estimates from electrician Woods at Light It Up Electric[] for the costs of replacing electrical wiring, a generator, and an [air conditioning] unit. The other line items in the Estimate came from a software called Xactimate which is commonly used by public adjustors in the insurance industry and insurance carriers. Weaver also included overhead and profit into the Estimate as he testified that generally in Pennsylvania[,] it is ten percent for overhead and ten percent for profit.

Additionally, Weaver believed he was present for an inspection of the property. Even if he wasn't, [] Reynolds, one of [] Weaver's employees, was present for an inspection of the property. Weaver described [] Reynolds['s] role as a claims manager who would go out and help inspect and assist the adjusters in putting together packages, estimates, scoping, and evaluating. Weaver testified that it was "his" [(Weavers's)] Estimate, and he stood by everything that was in it. [] Woods addressed the causation issue when he testified that the damage to the [Britcher's] electrical

system was caused by the power surge.

Erie challenges the credibility, methods[,] and conclusions of Weaver's testimony regarding the Estimate and argues that [Rule] 702 should preclude this testimony. However, these arguments go to the weight of his testimony rather than admissibility. ***See Thorson v. EDDW, LLC***, 309 A.3d 141, 151 (Pa. Super. 2024) ("To the extent that Appellants took issue with his credibility, methods, and conclusions, those arguments would go to the weight of [the expert's] testimony and not its admissibility as an expert opinion.").

Weaver's testimony regarding the Estimate met the requirements of [Rule] 702. His technical, or other specialized knowledge[,] is beyond that possessed by the average layperson. His knowledge was needed to help the trier of fact to understand the evidence or to determine the fact in issue, and his methodology is generally accepted in the relevant field. He relied on a computer program that is generally accepted in the insurance field and relied on [Woods's] and [] Reynolds['s findings], as experts in his field would do customarily. . . .

. . . Weaver reasonably relied on the kinds of facts and data an expert in his field would rely on in forming an opinion in this matter[,] and the Estimate and his testimony were properly admitted into evidence for the jury to consider.

Trial Court Opinion, 2/5/25, at 5-7 (record citations omitted).

As the court correctly noted, Weaver was qualified as an expert in damages. ***See*** Jury Trial N.T., 8/20/24, at 92 (Erie indicating that it had "[n]o objection" to this designation).

Generally, to qualify as an expert witness, one must only possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. In determining whether to admit expert testimony, the usual test to be applied is whether the witness has a reasonable pretension to specialized knowledge on the subject matter in question.

***Thorson***, 309 A.3d at 151 (internal quotation marks and citations omitted).

After our review, we observe that Weaver indicated that he had "credentialing from [his] family [construction] business [] that help[ed him] . . . make an estimate[,] to use the software[,] and figure out exactly what need[ed] to be done and how to price it[.]" N.T. Jury Trial, 8/20/24, at 100-01; **see also id.** at 90-91 (Weaver maintaining that he has created thousands of estimates over the last ten years); **id.** at 91 (Weaver establishing that he has a contractor's license and a public adjusting license). Weaver repeatedly stated that he believed he visited the at-issue property. **See id**. at 101-03. Nevertheless, he unequivocally testified that his employee visited and inspected the property, acquiring the data that was used to create the Estimate. **See id.** at 103-04. To the extent Weaver utilized the computer program Xactimate, he conveyed that it was the "industry standard software for the insurance field." **Id.** at 95. The Estimate included "a line-by-line breakdown of what needs to be repaired[.]" **Id.** at 105. Weaver referred to the Estimate as his own, a reflection of the application of his expertise. **See id.** at 107.

Given that Weaver's testimony was limited to damages, there is no daylight between the thrust of **Thorson** and the present matter. Although Weaver could have been clearer as to the processes employed in his data collection, we conclude that he "testified at trial about his professional background and the approach he took to produce a valuation of [the damage to the at-issue property.]" **Thorson**, 309 A.3d at 151. To the extent that Erie

is attacking the data Weaver relied upon or his approach insofar as it allegedly did not involve any knowledge beyond that of a layperson, Erie has pointed to no alternative as to how damages could or should have been calculated—aside from arguing that there were no damages at all. We again highlight that Erie failed to challenge Weaver's qualifications as a damages expert, implicitly acquiescing to the fact that he possessed technical or other specialized knowledge in that domain. We also emphasize that Erie "had the opportunity to cross-examine Weaver. [It was] also free to refute his testimony with [its] own evidence of [damages[4] (other than its assertion that there was no damage whatsoever)]." ***Id.*** As cogently stated in ***Thorson***, and as here,

> [t]o the extent that [Erie] took issue with [Weaver's] credibility, methods, and conclusions, those arguments would go to the weight of his testimony and not its admissibility as an expert opinion. ***See Gunn v. Grossman***, 748 A.2d 1235, 1240 (Pa. Super. 2000) ("The weight to be assigned to expert testimony lies within the province of the [finder of fact].").

***Id.***

Accordingly, as Erie's motion for a new trial was predicated on attacking the Estimate's admissibility and Weaver's status as an expert, there was no abuse of discretion committed by the trial court in denying Erie relief. Therefore, Erie is not entitled to appellate relief on its first issue.

In Erie's second claim on appeal, it argues that the court should have

---

[4] Indeed, Erie pursued this path by introducing Patel's expert testimony.

awarded it JNOV "both as a matter of law[] and because the evidence showed that no two reasonable minds could disagree that the verdict should have been rendered for the movant." Appellant's Brief at 34.[5]

"When reviewing a trial court's denial of a motion for [JNOV], we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict[.]" ***Garced v. United Cerebral Palsy of Philadelphia and Vicinity***, 307 A.3d 103, 113 (Pa. Super. 2023) (citation omitted). This Court reviews the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. ***See Hutchinson v. Penske Truck Leasing Co.***, 876 A.2d 978, 984 (Pa. Super. 2005). An abuse of discretion is defined similarly as noted above. ***See id.*** When reviewing the denial of a request for JNOV, we examine the evidence in the light most favorable to the verdict winner. ***See Thomas Jefferson Univ. v. Wapner***, 903 A.2d 565, 569 (Pa. Super. 2006) (citation omitted). As such, "the grant of [JNOV] should only be entered in a clear case[.]" ***Id.*** (citation omitted).

_____

[5] The court considered whether Erie's JNOV contention was adequately preserved and, thereafter, reached the conclusion in the affirmative. ***See*** Trial Court Opinion, 2/5/25, at 7-8 (ascertaining that "Erie did request a directed verdict and [the court] found where it occurred[]") (citing record of Erie making such a request). We, too, do not find waiver of this issue on this same basis. ***See Mazzie v. Lehigh Valley Hospital – Muhlenberg***, 257 A.3d 80, 87 (Pa. Super. 2021) (establishing that a litigant "must first request a binding charge to the jury or move for a directed verdict or a compulsory non-suit at trial" and that "[f]ailure to do so may result in waiver[]") (citations omitted).

There are two bases upon which a movant is entitled to JNOV: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." ***Rohm and Haas Co. v. Continental Cas. Co.***, 781 A.2d 1172, 1176 (Pa. 2001) (citation omitted). When an appellant challenges a jury's verdict on the "reasonable minds" basis, we will grant relief only "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." ***Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.***, 126 A.3d 959, 967 (Pa. Super. 2015) (citation omitted).

Erie begins by first conceding that the Britchers experienced a power surge. Nevertheless, while, in its capacity as insurer, it originally covered "the affected appliances[, which] were rated for 120 volts, the wiring of the [p]roperty itself[, the subject of the at-issue damages,] is rated for 600 volts, meaning that more electrical current is required to damage the wiring than would be required to damage an attached appliance." Appellant's Brief at 42.

Erie relies on the fact that its experts[6] performed an inspection of the property "approximately three months after [the Britchers'] expert." ***Id.*** at 43. Those experts opined that "all of the wiring was working appropriately" at the time of this latter inspection. ***Id.*** ("At the time of [Erie's] inspection, all of

_____

[6] Erie's expert testimony was comprised of Patel, a professional engineer, and Scott Plesce, an expert electrician.

the outlets passed the megohmmeter test."). Erie suggests that the Britchers "did not present any evidence to contradict this fact[.]" *Id.* Even assuming there was damage uncovered by the Britchers' expert's inspection, "the uncontroverted evidence demonstrates that those issues had either resolved themselves or been repaired by the time of [Erie's] inspection." *Id.* at 44. Accordingly, Erie contends that "there is no provable damage to the subject [p]roperty and no provable loss." *Id.* at 45.

To further emphasize its point, Erie relies upon the testimonies admitted at trial. First, it highlights Mr. Britcher's testimony wherein he stated that "[h]e was told by the power company that a surge of around 185 volts had gone through his [p]roperty." *Id.* at 47; *see also* N.T. Jury Trial, 8/19/24, at 84-85. Erie then describes Mr. Britcher's testified-to electrical problems, such as problems with his ice maker and oven, as not "linked either definitively or suggestively to a power surge that occurred months before." Appellant's Brief at 48.

Next, Erie delves into, and performs a comparative analysis on, both the trial and depositional testimony of one of the Britchers' experts, Woods. Woods's testimony provided insight into the megohmmeter testing that was performed on the property, a crucial part of the Britchers' evidence. Reflected in a report admitted at trial, Woods's megohmmeter testing resulted in the assignment of numerous failing grades to various outlets around the property. *See* Britchers' Trial Exhibit 4. A failing grade was explained to be that the

tested system did not reach 500 megohms. ***See*** N.T. Jury Trial, 8/20/24, at 57. Consistent with that report, Woods was concerned about the inhabitability of the property. ***See id.*** at 125.

Erie challenges, *inter alia*, Woods's testing on the property because his report generated in connection therewith has a misleading "Reading" column, which was only fully uncovered at trial. As explained by Woods in his trial testimony, that column only reflects a binary level of either "0" in the case of the outlet "failing" the test or "1000" in the case of the tested area "passing," notwithstanding Woods's subsequent concession that a failing grade meant that the tested component did not reach 500 megohms. ***See id.*** at 57; Britchers' Trial Exhibit 4. Erie indicates that Woods's testimony implies that the tested outlets could, and likely did, have *some* unreported level of electrical activity, which has been overlooked given the report's assignment of a "0" reading to the failing outlets. ***See*** N.T. Jury Trial, 8/20/24, at 57 (Woods testifying that he does not document the actual readings, in megaohms, when the system "fails"). As the Britchers' continued living in the subject property while they allege extensive problems with its wiring, Erie also questions Woods's conclusion, located in his report, that the property was deemed to be uninhabitable, posing a fire hazard. ***See*** Britchers' Trial Exhibit 4.

Erie further posits that Woods contradicted himself at several junctures between his deposition and trial testimony, specifically "pivoting" on the cause

of the surge and the results of the megohmmeter testing. *See* Appellant's Brief at 53. In particular, Erie notes that Woods originally explained that the power company described the electrical surge's cause as an "open neutral,"[7] *id.* at 54 (citing Woods's deposition), which, according to Erie, "does not, and cannot, involve voltages higher than 240," *id.*, yet at trial, Woods disclaimed it being an open neutral that caused damage to the property. *See* N.T. Jury Trial, 8/20/24, at 67 ("[T]he open neutral would be a different issue [Mr. Britcher] was dealing with beyond the surge itself."). As to the testing, Erie assumed, based on what Erie has described as Woods's ambiguous depositional testimony given prior to trial, that the readings of "0" meant there was no electrical activity coming through those outlets. *See* Appellant's Brief at 54-55. Instead, at trial, Woods indicated that a reading of "0" simply meant that the outlet failed the test, rather than providing a reading of whether, and to what extent, electricity was flowing through the outlet. *See* N.T. Jury Trial, 8/20/24, at 57.

As to Erie's own experts, Erie notes that Patel's testimony discussed the "substantially flawed" nature of Woods's testing. Appellant's Brief at 59. Moreover, Erie argues that, based on Patel's reading of Woods's report, Patel

_____

[7] Erie defines an open neutral as occurring "when the wire that stabilizes the electrical current and distributes it evenly throughout the [p]roperty becomes disconnected. As a result, circuits and outlets that are accustomed to receiving 120 volts of current would receive up to twice that amount – 240 volts." Appellant's Brief at 65.

was surprised that people were still living at the property and that the property was still electrified. All of the outlets that Woods had tested that had registered "0" were able to pass Patel's subsequent testing. Patel also testified that the surge experienced by the property was caused by an open neutral, which, given that such a circumstance "would result in an increase of voltage running through the wiring of the residence, up to 240 volts[,]" such an event was incapable of damaging the property's wiring "which is rated for 600 volts[.]" *Id.* at 60 (record citations omitted).

Erie concludes by highlighting the various testing done, pointing to Patel's megohmmeter testing, which showed all tested outlets as passing. **See** *id.* at 62. Erie stresses that the Britchers did not challenge or contradict Patel's testimony or report. Erie also avers that the open neutral condition was incapable of damaging wiring to a property that was rated for 600 volts. **See** *id*. at 65-66.

The trial court determined that, on this issue of JNOV, Erie's challenge was actually directed towards "the weight of the evidence supporting the jury's verdict." Trial Court Opinion, 2/5/25, at 10. The court noted that Erie's argument was primarily based on the Britchers having not "seriously" challenged Erie's experts, who, *inter alia*, concluded that the property, as of the date of their later testing, showed no signs of electrical damage. **See id.** at 12. Nevertheless, it quoted this Court's oft-repeated statement regarding the jury's purview as to witnesses—that factfinders are not required to accept

a witness's testimony, even if uncontradicted. *See id.* at 13 (quoting *Wright v. Eastman*, 63 A.3d 281, 291 (Pa. Super. 2013)).

> The court then summarized Erie's arguments as to its JNOV claim:
>
> (1) [] Patel cited "specific errors and inconsistencies" in [Woods's] findings[] and [opined] that Woods conducted the testing improperly. (2) The claimed damages were impossible because [] Patel testified that Woods conducted the meter readings improperly, and [the Britchers] did not present any evidence contradicting Patel. (3) Patel took issue with Woods'[s] megohmmeter readings and opined they were inaccurate. (4) Woods did not opine on or contradict the testing performed by Patel and [] Piesce.

Trial Court Opinion, 2/5/25, at 13-14.

Claims challenging the weight of the evidence, as opposed to challenges to the sufficiency of the evidence, are not cognizable when seeking JNOV. *See Morin v. Brassington*, 871 A.2d 844, 851 (Pa. Super. 2005) (establishing that the proper vehicle for a weight-of-the-evidence claim is a motion for a new trial, not a motion for JNOV, with the latter challenging the sufficiency of the evidence). The court, therefore, found that, given the discordant nature between Erie's request, i.e. JNOV, which necessarily invokes a sufficiency challenge, and the support underpinning its argument, i.e. attacking the Britchers' expert and lay testimony and bolstering its own expert testimony, a weight-based challenge, Erie waived review of its claim. *See* Trial Court Opinion, 2/5/25, at 14 (quoting *Fanning v. Davne*, 795 A.2d 388, 393 (Pa. Super. 2002) and *Estate of Hicks v. Dana Companies LLC*, 984 A.2d 943, 960-61 (Pa. Super. 2009)). We agree.

As succinctly summarized by the Britchers, in essence, all of Erie's arguments amount to the jury being "simply wrong" to believe Woods over Patel. *See* Appellees' Brief at 39. In effect, Erie is asking this Court to reweigh the respective testimonies of these two experts who reached opposite conclusions, which, notwithstanding our inability to do that generally, is not germane to a JNOV claim. *Cf. Koller Concrete, Inc. v. Tube City IMS, LLC*, 115 A.3d 312, 321 (Pa. Super. 2015) ("[Appellant's] argument does not attack the sufficiency of [appellee's] evidence, but rather the weight the jury should have ascribed to [appellee's] evidence. [Appellant] is asking this Court to 'invade the province of the jury,' and that is not a basis for JNOV."). Instead, JNOV, *inter alia*, requires viewing the evidence in the light most favorable to the verdict winner. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 890 (Pa. Super. 2011). However, Erie ignores this rule; its arguments effectively call for the discounting of *all* testimony proffered by Woods, given various apparent contradictions or uncertainties that he offered, while maintaining that its own expert testimonies are unassailable.[8] As the court properly found Erie's claim to be a weight-based challenge brought via a JNOV request, we

_____

[8] Although it is unrefuted that Erie's experts tested the property after Woods, Erie fails to identify any authority establishing that this later testing provides the "final say," as a matter of law, as to the issue of whether damages were ultimately established at trial. Instead, we are left with what can only be described as dueling expert opinions on the issue of damages, thereby requiring a factfinder's credibility assessment for resolution.

- 18 -

find no abuse of discretion or error of law in the trial court finding this contention waived on that basis.

Nevertheless, even if Erie properly sought JNOV, it would still not be entitled to relief. Woods unequivocally testified that, after testing the property and analyzing the results, he was certain "as to the failure and the damage caused to [the Britchers'] property as a result of [the] surge[.]" N.T. Jury Trial, 8/20/24, at 66. Conversely, Patel testified that, based on his own analysis, there was no damage to the property at that juncture. The jury then resolved this testimonial discrepancy by implicitly believing Woods over Patel.

After our thorough review of the record, and in viewing all evidence in favor of the Britchers as verdict winners, we conclude that there was sufficient competent evidence adduced to sustain the verdict. **See, e.g.**, N.T. Jury Trial, 8/20/24, at 53-60 (Woods's discussion on how he collected the data leading to his report and elaboration on the report's contents), 60-61 (Woods connecting the surge to the property damage), 74-75 (Woods highlighting various issues with Patel's testing), 82-87 (Woods stating why Patel's concerns with his testing were unfounded). With evidentiary support to establish that the property was damaged—resulting from a surge—Erie failed to demonstrate a "clear case" that it was entitled to judgment as a matter of law or that no two reasonable minds could disagree that a verdict in its favor was warranted. **See Rohm and Haas Co.**, **supra**. Therefore, we find that the court did not commit an error of law or abuse its discretion in its denial of

Erie's request for JNOV. Accordingly, we affirm judgment in favor of the Britchers.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/9/2025